FILED
3/27/2023
Court of Appeals
Division I
State of Washington

THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83328-6-I |
| Respondent, | |
| v. | DIVISION ONE |
| GUILLERMO CORDOVA RIVERA, | UNPUBLISHED OPINION |
| Appellant. | |

ANDRUS, C.J. — Joel Hernandez[1] appeals his convictions for rape, assault, and harassment of his former domestic partner, MRC. He challenges the trial court's evidentiary rulings, arguing the exclusion of evidence of his and his victim's immigration status violated his right to present a defense. He also argues the second degree rape verdict violated his right to jury unanimity under *State v. Petrich*.[2] Finally, he contends the trial court erred in allowing a police officer to testify that she felt MRC needed her protection. We affirm.

FACTS

MRC and Hernandez had an on-again, off-again relationship between 2019 and 2021. According to MRC, they fought often, usually about Hernandez's failure

---

[1] Although the State identified the defendant by the name Guillermo Cordova Rivera, he has indicated that Joel Hernandez is his given and preferred name. We will use that name here.
[2] *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984).

Citations and pin cites are based on the Westlaw online version of the cited material.

to contribute money for rent and other bills and Hernandez's accusations that MRC was dating other men. MRC testified that Hernandez became violent on at least one of these occasions, hitting and strangling her after she received a message from her manager. MRC called the police several times to report his assaultive behavior. But when Hernandez begged her to forgive him, the couple usually reconciled.

In early 2021, MRC asked Hernandez to move out because she did not want her 17-year-old son to hear their fights concerning rent money. On the morning of March 6, 2021, about a week after the couple separated, Hernandez called MRC to ask if they could "get together after . . . work." MRC agreed to meet at a Lynnwood Walgreens because Hernandez owed her money and she needed money to pay rent.

MRC parked her vehicle in the Walgreens parking lot around 8:00 p.m. and she saw Hernandez arrive soon after on foot. Hernandez got into her vehicle, where the two began arguing about the money Hernandez owed MRC and his accusations that she was seeing other men. When Hernandez began insulting her, MRC told him to get out of the car and she drove away. A few minutes later, Hernandez called MRC and asked her to "please come back . . . we need to fix this up." But when she returned, the couple began arguing again. Hernandez wanted to reconcile; MRC did not. Hernandez questioned her motivation for not wanting him back in her apartment and claimed she had someone else living with her. At some point, Hernandez asked her to drive him to a nearby gas station so he could buy some beer and calm down. She agreed.

After Hernandez had 3 or 4 beers, he became aggressive and tried to force MRC to take him back. She refused, explaining that she did not want him in her home anymore. When Hernandez demanded sex, she refused. Hernandez, angry at her reaction, pulled her hair, forcing her down to the floor of the car. She pushed him away, scratching him in the process. Hernandez began insulting her, calling her ugly, fat, and useless, and threatened to kill her and to hurt her children. MRC fought back and kicked him out of the car.

Hernandez then revealed to MRC that he had purchased a white Acura with money he owed her. MRC took a picture of the car with her phone so she could recognize his vehicle if he came near to her house. When MRC told Hernandez she intended to call 911, he grabbed her phone. He hit her, pulled her by the hair, and dragged her along the road, scraping her legs. He pulled her shirt off in the process. When Hernandez succeeded in obtaining MRC's phone, he threw it away "into a garden." Hernandez also took the keys to MRC's car.

Hernandez told MRC to get into his Acura while he searched for her phone and keys; MRC complied. Hernandez found MRC's phone but could not find her keys. He pocketed the phone and drove the Acura to a different parking lot. There, Hernandez grabbed MRC by her hair and forced her to perform oral sex. After 15 or 30 minutes, Hernandez pulled out a knife and threatened to kill MRC. MRC agreed to have vaginal intercourse with Hernandez as a way to convince him to put his knife away. Hernandez reclined his seat, picked her up and placed her on top of him and tore MRC's underpants in the process. When MRC's lower back banged against the steering wheel, MRC asked Hernandez to calm down. The

couple then moved to the backseat and remained there with Hernandez forcing MRC to engage in various sex acts until another car entered the lot.

At that point, Hernandez drove to a more isolated area, continuing to insult and threaten her, and demanding sex. This time, MRC fought back. When Hernandez began driving toward MRC's home, she tried to stop him by grabbing the steering wheel. He struck her face with his hand between her nose and cheek, told her not to touch the steering wheel, and threatened to leave her by the side of the road on the freeway if she did so again.

They arrived at MRC's house around 7:00 a.m. They went into MRC's bedroom, where Hernandez forced her to have sex again. Later that morning, Hernandez dropped MRC back at Walgreens so she could pick up her car and he left for work. MRC called 911 from the Walgreens parking lot.

Lynwood Police Officer Donald Blakely responded to the call and found MRC sitting in her vehicle, visibly upset, shaking, crying, and disheveled. Blakely escorted her to the hospital, where MRC underwent a sexual assault examination. The nurse who performed the examination found and documented tenderness, bruising, and abrasions on MRC's lower back, inner thigh, chest, legs, arms, and jaw. MRC had large abrasions on her left hip, and deep red bruises on both breasts. The nurse also collected MRC's torn underwear and provided them to the police as evidence.

Detective Mehl of the Edmonds Police Department[3] contacted Hernandez at his workplace that afternoon. Hernandez told Detective Mehl that he and MRC had had consensual sex the night before and that she often threatened to call the police on him. Detective Mehl observed "a large chunk of skin missing from [Hernandez's] left cheek and then several small cuts on his face and on his hands." He photographed the cuts and obtained a DNA sample from Hernandez. After meeting with police, Hernandez returned the white Acura to his boss, the actual owner of the vehicle, claiming it did not work properly and he no longer wanted to purchase it.

Hernandez was arrested the next day. The State charged him with first degree rape, second degree rape, first degree kidnapping, second degree assault, and harassment. Hernandez relied on the defense of consent at trial, arguing that MRC frequently called the police when she did not get her way in their arguments about money and that she had fabricated the story of being raped.

Hernandez denied raping or assaulting MRC. He admitted that the two had recently separated, that he had called MRC to meet at the Walgreens on March 6, and that they argued when they met that night. Hernandez also admitted they argued about money, but claimed he gave her his entire paycheck and MRC did not believe it was enough. He confirmed he was undocumented and, as a result, did not have a bank account. He also testified that MRC threatened to call and often did call the police to make false allegations against him.

---

[3] At this point in the investigation, the police did not know whether the crimes occurred in Edmonds or Lynwood. When the investigating officers concluded that the locations MRC described were all in Lynwood, the Lynwood Police Department took over the investigation.

Hernandez recounted that on the night of March 6, the two picked up some beer, after which MRC wanted to go dancing and have sex in her vehicle. He claimed that when he told her he had purchased the white Acura, she became angry. He said he then got out of her car and began walking to his car, but MRC followed him, threatening to run him over. He admitted that the two got into a physical altercation when he pulled her car keys out of the ignition and grabbed her cell phone. Hernandez testified that eventually he calmed MRC down and they fell asleep together in the back seat of his car. When they awoke, Hernandez said, he suggested they return to her house, and MRC agreed. He admitted that while en route, MRC grabbed his steering wheel, forcing him to pull over, although he claimed to have no idea why she did so. He stated that when he convinced her to stop grabbing the wheel, they drove to her house, where they had consensual sex two more times. In the morning, Hernandez said, he drove MRC to her vehicle in the Walgreens parking lot where he searched for the missing keys. According to Hernandez, MRC had a spare set of keys to start the vehicle, so he left and went to work.

The jury found Hernandez guilty of four counts—first degree rape, second degree rape, second degree assault, and harassment.[4] The trial court sentenced Hernandez to an indeterminate sentence of 240 months to life in prison.

---

[4] At the close of the State's case, the court dismissed the kidnapping charge for insufficient evidence.

ANALYSIS

Right to Present a Defense

Hernandez first argues that, while the trial court allowed him to testify that he was undocumented to explain why he used different names, he was not permitted to testify that MRC "threatened to call immigration in addition to the police, that his undocumented status made her calls to the police an effective control mechanism, or that she controlled their money and housing because of her own legal status." Hernandez argues the trial court's evidentiary rulings limiting this evidence violated his constitutional right to present a defense. We disagree.

A. Trial Court's Evidentiary Rulings

Hernandez argued below that MRC "controlled [his] money and his life by frequently threatening to contact the police or immigration on him. Although both [MRC] and Joel are recent immigrants to America, [MRC] is documented, whereas Joel is not." As a result of MRC's threats, Hernandez argued, he "lived in fear."

Pretrial, the parties discussed the admissibility of this evidence with the court. Hernandez contended if the State introduced evidence that he used multiple different names, he should be permitted to explain why he did so. He further maintained that his undocumented status was relevant to explain his reaction to the police when they arrived at his workplace. Finally, he argued the evidence was relevant to explain why MRC controlled the couple's money:

> He did not have a bank account because he was undocumented. She did have a bank account. He gave her all of his earnings to put in that bank account which she used to pay rent, et cetera. And once they had broken up and he was not living with her anymore, he did not have access to his money and also did not have a place to live. . . . And every time they lived together, only her name was on the lease because he was undocumented. And so, if they would get in an

- 7 -

argument, he would be the one who would have to leave and was essentially living on the streets in numerous circumstances.

Hernandez asserted that this evidence was an "essential element of the defense."

The State argued that the evidence was not relevant and was inadmissible under ER 413(a), which lays out procedural requirements for the admission of evidence of a party's or a witness's immigration status to show bias or prejudice.

The trial court ruled that if the State offered evidence that Hernandez used several different names, then the issue of why he did so was relevant and Hernandez could explain that he did so because he was undocumented. Hernandez testified, consistent with this ruling, that his birth name is Joel Hernandez, but that he has used the names Guillermo Cordova Rivera and Miguel Carranza because of his immigration status.

The trial court further ruled that offering evidence of Hernandez's immigration status to explain why he reacted a certain way to police was not offering that evidence to show bias or prejudice and, as a result, ER 413 did not apply or require the exclusion of this evidence. It nevertheless ruled that while Hernandez could testify about how and why he reacted to the police on the day he was interviewed and that his reaction was based on MRC's threat to call the police, he could not testify that it was based on his immigration status. The trial court did not indicate the evidentiary basis for this limitation, although in context it appears to have been an analysis under ER 403.

Finally, with regard to the argument that Hernandez lacked a bank account or any earnings and that MRC controlled him financially, the court ruled that "if that's admissible under the other rules, and that's part of his defense, he can testify

to that as well." But the court said that the reason he lacked a bank account was not relevant. The trial court did not indicate the evidentiary basis for this limitation.

The State also moved to exclude extrinsic evidence that MRC had previously made a false report to police about Hernandez, arguing the evidence was inadmissible under ER 404(b). Hernandez argued that MRC had, a year earlier in March 2020, called the police and reported that he had threatened her with a knife, pulled her hair, and stolen personal items from her home during a fight about money. He contended he should be permitted to question MRC about this incident because her credibility was key and her prior false report was relevant to proving a "common scheme and plan" to report Hernandez to the police whenever she was angry at him about money. The trial court conducted an evidentiary hearing regarding the March 2020 incident, taking testimony from Hernandez, MRC, and two police officers involved in investigating the March 2020 incident. The trial court ruled that Hernandez had established by a preponderance of evidence that a portion of MRC's report to police was false and allowed Hernandez to present this evidence at trial, both by questioning MRC and Hernandez about the incident and by calling the two investigating officers.

In opening statements, Hernandez informed the jury that MRC had repeatedly threatened to call police and immigration authorities on Hernandez. His attorney indicated that the jury would hear evidence that MRC had made multiple false reports to the police about Hernandez, including the March 2020 incident. Hernandez also suggested that after the alleged rapes, the police showed up at his place of employment and Hernandez talked to them, but was guarded in doing so because he did not want to disclose that he was an undocumented immigrant.

At the conclusion of opening statements and outside the presence of the jury, the court questioned Hernandez's counsel about the reference to MRC threatening to call immigration and to MRC calling the police on multiple occasions. Hernandez's attorney understood the trial court's pretrial ruling to preclude her from "talk[ing] about [MRC's] immigration status," but not to exclude evidence that MRC had threatened to call immigration. And counsel noted that the State's ER 404(b) motion related only to the admissibility of extrinsic evidence of the March 2020 incident and did not cover evidence from MRC herself about other times she had called the police.

At that point, the trial court clarified its earlier ruling as, "testimony could be in relation to threatening to call the police, [but] not Immigration." Again, the trial court did not explicitly indicate the evidentiary basis for the ruling.

B. Analysis of Evidentiary Rulings

Hernandez contends that the trial court violated his right to present a defense by excluding evidence that MRC "enjoyed legal status, that she had threatened to call immigration, and that because of his undocumented status, Hernandez had no bank account, was not named on the lease for their apartment, and was terrorized by her threats."

A criminal defendant's right to present a defense is guaranteed by both the federal and state constitutions. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. These constitutional protections permit judges to "exclude evidence that is repetitive . . . , [is] only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues." *State v. Jennings*, 199 Wn.2d 53, 63, 502

P.3d 1255 (2022) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)).

To determine whether the exclusion of evidence violates a defendant's constitutional right to present a defense, we engage in a two-part analysis. *State v. Arndt*, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019). First, we review a trial court's evidentiary rulings for abuse of discretion. *Jennings*, 199 Wn.2d at 53. A trial court abuses its discretion if no reasonable person would take the view adopted by the trial court. *Id.* at 59.

Second, if the evidentiary rulings were not an abuse of discretion, we determine whether these rulings nevertheless violated a defendant's constitutional rights de novo. *State v. Clark*, 187 Wn.2d 641, 648-49, 389 P.3d 462 (2017); *Jennings*, 199 Wn.2d at 59. In assessing a constitutional challenge to a trial court's evidentiary decision, we determine if the evidence is at least minimally relevant. *State v. Orn*, 197 Wn.2d 343, 353, 482 P.3d 913 (2021). A defendant has no constitutional right to present irrelevant evidence. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). "If the evidence is relevant, the reviewing court must weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence to determine if excluding the evidence violates the defendant's constitutional rights." *Jennings*, 199 Wn.2d at 63. The State must demonstrate that the evidence is "so prejudicial as to disrupt the fairness of the fact-finding process at trial." *Jones,* 168 Wn.2d at 720 (quoting *State v. Darden*, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002)).

We first must address Hernandez's characterization of what evidence the trial court actually excluded at trial. While the trial court did exclude evidence of

MRC's immigration status, it did not exclude evidence that Hernandez lacked a bank account, that he was not named on any lease to their various apartments, or that he was "terrorized by [MRC's] threats." In fact, Hernandez testified he had no bank account and did not pay rent directly to their landlord. Hernandez elicited evidence from MRC that her name, not his, was on the lease for the home in which the two resided together. Finally, Hernandez testified he felt "terrorized" whenever MRC called the police.

The trial court only excluded evidence that MRC was a documented immigrant and that she threatened to call immigration authorities, presumably to report Hernandez's unlawful presence in the country. Hernandez does not argue that the trial court abused its discretion in excluding this evidence under the applicable rules of evidence.[5] We therefore move to the second question: whether the ruling violated Hernandez's constitutional right to present a defense.

We can see, in hindsight, how MRC's immigration status may have had some minimal relevance. The fact that MRC was not at risk of deportation could lend credibility to Hernandez's testimony that MRC controlled him by threatening to call immigration.[6] But the State has a compelling interest in not allowing the parties' respective immigration status to distract the jury. As recent Supreme Court decisions have illustrated, undue attention on the subject of nationality, ethnicity,

---

[5] Hernandez argues the trial court erred in excluding this evidence under ER 413(a), citing *State v. Chicas Carballo*, 17 Wn. App. 2d 337, 486 P.3d 142 (2021). But the trial court did not exclude any evidence based on Hernandez's noncompliance with the procedural requirements of ER 413(a) and we therefore need not address the argument.

[6] We note that this argument was not the one Hernandez advanced below. At trial, Hernandez contended that the difference in their immigration status explained why he was the one who had to leave the shared home after they argued. This evidence, he argued, was relevant to "show the situation that [Hernandez] had been placed in by this complaining witness."

- 12 -

or race can inject prejudice into a case and provide grounds for reversal. *See State v. Bagby*, No. 99793-4, Slip op. (Wash. Jan. 19, 2023)[7] (prosecutor asking witnesses to describe African American defendant's "nationality" and other comments unnecessarily emphasizing the defendant's race constituted prosecutorial misconduct); *Henderson v. Thompson*, 200 Wn.2d 417, 421-22, 518 P.3d 1011 (2022) ("If racial bias is a factor in the decision of a judge or jury, that decision does not achieve substantial justice, and it must be reversed").

The State has a further compelling interest in limiting inherently prejudicial testimony alleging that a documented immigrant victim called or threatened to call immigration enforcement authorities on an undocumented immigrant domestic partner. This testimony runs the risk of causing the jury to think less of MRC, not because her version of the rapes lacked credibility, but because she used threats of deportation against a vulnerable member of the community. Such evidence is not only prejudicial but not probative of the victim's credibility.

More importantly, the trial court's evidentiary rulings did not prevent Hernandez from presenting his version of events. "At its core, the constitutional right to present a defense ensures the defendant has an opportunity to defend against the State's accusations." *Jennings*, 199 Wn.2d at 66. In *State v. Hudlow*, 99 Wn.2d 1, 18, 659 P.2d 514 (1983), the Supreme Court affirmed the exclusion of evidence of the past sexual behavior of the victims because the decision "did not deprive respondents of the ability to testify to their versions of the incident. They did so and simply were not believed by the jury."

---

[7] https://www.courts.wa.gov/opinions/pdf/99793-4.pdf

As in *Hudlow,* the trial court's ruling excluding evidence of MRC's immigration status did not preclude Hernandez from testifying fully about his version of events on the night of March 6 and morning of March 7, 2021. Hernandez was able to present evidence that MRC consented to their sexual activities and that he did not rape, assault or harass her. He presented evidence that MRC had previously made false reports to the police and, on at least one occasion, made very similar accusations to the report she made on March 7, 2021. He presented evidence that MRC regularly used threats of making false reports to the police to force him to give her money.

The evidence allowed Hernandez to argue that MRC was the controlling partner in this relationship. In closing argument, defense counsel directly addressed the alleged power imbalance between Hernandez and MRC:

> We know this relationship was unbalanced. We know that [MRC] had the ability to have her name on a lease, the ability to have a bank account. We know that she's nearly ten years older than Joel, that Joel had to give her all his money. But it still wasn't enough.
>
> We know that she's called the police on Joel many, many times.

Hernandez was thus permitted to argue—and offer evidence supporting his argument—that MRC had a degree of control over him and fabricated allegations of being raped to further that control. The evidence of MRC's alleged false police reports was far more compelling and probative of her credibility than evidence that she threatened to call immigration authorities but never did so. Hernandez's right to present this prejudicial, marginally relevant, and cumulative evidence does not outweigh the State's interest in limiting its prejudicial effects. The court's

evidentiary rulings did not deprive Hernandez of his constitutional right to present this defense.

Jury Unanimity

Hernandez next challenges his second degree rape conviction, arguing that the State failed to clearly elect the act on which it relied for this charge. We conclude that the State's election in closing arguments was sufficient.

In Washington, a defendant may be convicted only when a unanimous jury concludes that the criminal act charged in the information has been committed. *State v. Stephens*, 93 Wn.2d 186, 190, 607 P.2d 304 (1980). When evidence indicates that several distinct criminal acts have been committed, the State may elect the act on which it will rely for the conviction. *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984). Alternatively, unanimity will be protected by a jury instruction requiring all 12 jurors to agree that the same underlying criminal act has been proved beyond a reasonable doubt. *Id.* Courts consider several factors when determining whether the State elected a specific criminal act, including the charging document, the evidence, the jury instructions, and the State's closing argument. *State v. Kier*, 164 Wn.2d 798, 813-14, 194 P.3d 212 (2008).

Hernandez argues the State presented evidence of two different occasions of forced intercourse that could have formed the basis for a second degree rape conviction. During her testimony, MRC described several instances of nonconsensual sex in Hernandez's car and in her apartment. The State argues, however, that it clearly elected to proceed on the single incident of forced oral penetration in Hernandez's car as the basis for the second degree rape charge. We agree.

During closing argument, the prosecutor stated:

> [W]e move into the rapes that occurred within the car. The defendant's car. The white Acura. And I am going to start with jury instruction number 15 which is the crime of second degree rape, <u>because chronologically the second degree rape occurred first</u>. And jury instruction number 15 tells you that there are three elements the State has to prove beyond a reasonable doubt. First, that on or about March 6, 2021, through March 7, 2021, the defendant engaged in sexual intercourse with [MRC], that the sexual intercourse occurred by forcible compulsion, and that this act occurred in the State of Washington.

(Emphasis added.) The prosecutor then discussed different types of sexual contact that can constitute rape, before stating:

> So, in the rape in the second degree, <u>the State has alleged that the oral penetration is the sexual intercourse here</u> . . . .
>
> [MRC] has described for you that during this oral penetration, she remembers the defendant pulling her hair really hard in order to pull her towards him. And she can't remember exactly how his pants were at the time because he pulled her so hard. And I asked her: When he pulled your hair to where your mouth touched his penis, how much strength did you feel? And she said: From a scale of 1 to 10, she felt an 11. That is how much force the defendant used to control her head, to control her movement such that she had no choice but to comply and perform this oral penetration.
>
> And from there, he held onto her head. He bent her over. And she said that she was forced to engage in oral sex as the defendant was insulting and threatening her over and over again. And she testified that this occurred in the front seat of his vehicle.

(Emphasis added.) The prosecutor did not argue that any other criminal act was the basis for the charge of second degree rape.

Hernandez argues that this statement in closing argument is insufficient to constitute an election under *Petrich* because the State did not explicitly disclaim its intention to rely on the sexual assaults that occurred in MRC's bedroom the following morning. Hernandez relies on *State v. Carson*, 184 Wn.2d 207, 357 P.3d

- 16 -

1064 (2015) to argue that the State must not only affirmatively elect the criminal acts on which it is relying but also explicitly inform the jury it may not consider any other acts that could constitute the same crime.

We conclude Hernandez has misread the holding in *Carson*. In that case, the State charged the defendant with three counts of first degree child molestation. 184 Wn.2d at 210. The child victim, when interviewed forensically, identified three specific incidents of molestation. *Id.* at 212. At trial, however, the child could not recall details of the incidents and was unable to confirm or recount most of the details he had described earlier. *Id.* In its closing, the State told the jury that the three incidents recounted by the child victim in his forensic interview "were the only incidents that the State 'would like you to focus on for the purposes of your deliberations.' " *Id.*

The court held that this statement was sufficient to disclaim reliance on any other acts of sexual misconduct. 184 Wn.2d at 229. In a footnote, the court stated that "the State must not only discuss the acts on which it is relying, it must <u>in some way</u> disclaim its intention to rely on other acts." *Id.* at 228 n.15 (emphasis added). But *Carson* affirmed the State's election even though it did not explicitly disclaim reliance on any other acts of sexual molestation. Thus, we do not read *Carson* as requiring the State to identify, explicitly, the acts on which it is <u>not</u> relying for a conviction. *Carson* merely held that the words the prosecutor uses must "in some way" make it clear the State is relying on one specific act for a charge and not any other. The closing argument met that test here.

The State explicitly stated it was relying on the forced oral sex that occurred first in time, in Hernandez's car, as the basis for the second degree rape charge.

Not only did the State say so but it then walked the jury through the evidence and, in doing so, discussed only this specific incident of oral sex. The prosecutor's election was effective and Hernandez's right to jury unanimity was protected.

### Improper Opinion Testimony

Finally, Hernandez challenges the testimony of a police officer who was present at MRC's sexual assault examination, who stated that she believed MRC needed protecting "from the person she was accusing." Because Hernandez did not object to the testimony at trial, we decline to address whether the statement constituted improper opinion testimony that violated his right to a jury trial.

As a general rule, appellate courts will not review an issue raised for the first time on appeal. RAP 2.5(a). A party may, however, raise manifest error affecting a constitutional right for the first time on appeal. RAP 2.5(a)(3). Constitutional error is manifest only when the error caused actual prejudice or practical and identifiable consequences. *State v. Montgomery*, 163 Wn.2d 577, 595, 183 P.3d 267 (2008). "Admission of witness opinion testimony on an ultimate fact, without objection, is not automatically reviewable as 'manifest' constitutional error." *State v. Kirkman*, 159 Wn.2d 918, 936, 155 P.3d 125 (2007). Instead, the defendant must show that the testimony was "an explicit or almost explicit witness statement" that the witness believed the victim's accusations. *Id.* Hernandez does not meet this standard.

After MRC was taken to the hospital on the morning of March 7, Edmonds Police Officer Katie Brown was dispatched to the hospital to interview her. Officer Brown met with her before she underwent a sexual assault examination and when the nurse arrived, Officer Brown waited outside for the duration of the examination.

- 18 -

When the prosecutor asked Officer Brown if she typically stays for the entirety of a sexual assault examination, she responded that this was one of the first examinations she had attended as a police officer and "it didn't feel right to leave [MRC] by herself in the hospital." When the prosecutor asked what she meant, Officer Brown replied: "Based on the demeanor I saw . . . it didn't feel correct to leave her alone. My job is to serve and protect people. And she felt like someone I needed to protect in that moment . . . from the person she was accusing."

Officer Brown did not directly testify that Hernandez was guilty of raping MRC or that she believed MRC's version of events. Although a juror could infer from Officer Brown's testimony that she found MRC and her fear of Hernandez credible, opinion testimony "relating only indirectly to a victim's credibility" does not rise to the level of manifest constitutional error. *Kirkman*, 159 Wn.2d at 922. Hernandez has not established that Officer Brown's testimony constituted manifest constitutional error and we decline to address this claim.

Affirmed.

Andrus, C.J.

WE CONCUR:

Díaz, J.

Duyn, J.

- 19 -