**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

THE STATE OF WASHINGTON,

                  Respondent,

        v.

GILDARDO BRAVO,

                  Appellant.

No. 85030-0-I

DIVISION ONE

PUBLISHED OPINION

MANN, J. — A jury convicted Gildardo Bravo of rape of a child in the first degree. At trial, Bravo sought to cross-examine the victim, M.H., about her and her family's pending U visa application. A U visa grants temporary legal residence to a person who is the victim of a qualifying crime and who helps law enforcement investigate or prosecute that crime.[1] Qualifying crimes include, among other things, rape, domestic violence, and sexual assault.[2] The trial court limited Bravo's cross-examination of M.H. to her knowledge at the time of her initial report to investigators—six years before her trial testimony. The court also precluded cross-examination of M.H.'s sister, L.H., as to their immigration status.

---

[1] State v. Romero-Ochoa, 193 Wn.2d 341, 344, 440 P.3d 994 (2019).
[2] 8 U.S.C. § 1101(a)(15)(U)(iii).

Bravo appeals and argues that exclusion of the U visa evidence violated his state and federal constitutional rights to confront witnesses. We agree with Bravo, reverse his conviction, and remand for a new trial.[3]

I

A

In 2011, when M.H. was around eight years old, she traveled from Mexico to the United States alone. M.H.'s mother, Regina Ventura Lopez, arranged for Bravo to pick up M.H. in California. M.H. had never met Bravo.

M.H. and Bravo initially lived with Bravo's aunt, uncle, and three boys in Everson, Washington. While there, M.H. slept with Bravo on a mattress on the floor in the living room. A few nights after she arrived, M.H. testified that Bravo told her that you kiss differently in the United States than in Mexico, and he began kissing her and putting his tongue in her mouth. M.H. testified that he then pulled down her pants and shoved his penis into her causing her a lot of pain. Bravo told M.H. that it was normal for this to happen. M.H. stated that it hurt a lot, and there was a lot of blood.

After Bravo stopped, M.H. testified that she texted her mom asking "is it okay for Gildardo to put his thing in my little thing." Her mom did not respond to the text message. M.H. testified that in the morning after she sent the text, she did not know where her phone went. Sometime later, M.H. testified that Bravo found her phone and gave it back to her, but her phone was wiped clean. Bravo testified about the text message stating, "I saw a text message on [her phone] that was not sent . . . [the text

---

[3] Because we reverse and remand for a new trial, we do not reach other issues raised by Bravo's appeal.

message] said something about like; mom is [it] okay if he puts his things on me, something like that." Bravo explained that after he saw the message, he called Lopez and said that he no longer felt comfortable having M.H. around him anymore because of what he had seen in the message. Bravo testified that he told Lopez he wanted to give her M.H. so that she could have her checked at a clinic so there wouldn't be any misunderstanding.

M.H. stated that a week later Bravo rented an apartment by himself and "the same thing happened" two more times in the apartment. At trial, M.H. testified that Bravo came into her room one night at the new apartment and began rubbing her vagina. M.H. testified to a third incident in which Bravo lit candles around the bathtub, took a bath with M.H., and rubbed the inside of her vagina.

Lopez and M.H.'s sister, L.H., eventually entered the United States from Mexico. Lopez began a romantic relationship with Bravo, they married, and moved to Illinois. Lopez and Bravo separated in 2016. Lopez, M.H., and L.H. then moved into a shelter in Illinois.

In 2016, Sergio Valiente, a child protection investigator with the State of Illinois, received a confidential tip of potential sexual abuse involving M.H. He met with M.H. in the shelter to discuss the allegations. Valiente also interviewed Bravo who confirmed he had seen a text message from M.H. to her mother, but denied the allegations.

On August 22, 2017, a YMCA domestic violence advocate called on behalf of M.H.'s mother who wished to report a sexual assault that had occurred in Everson, Washington in 2011. When Everson Police began investigating, they learned that

Whatcom County Sheriff's Office had received a report from the Illinois Department of Children and Family Services in December 2016.

On September 12, 2018, the State charged Bravo with three counts of rape of a child in the first degree. A second amended information altered count II to rape in the second degree, or in the alternative child molestation in the first degree.

B

The State moved in limine to exclude any reference to the witnesses' current immigration status. During oral argument on the motion the State asserted that it wanted to limit the witnesses from being asked what their current immigration status was. Bravo did not object. The trial court granted the motion stating that the current immigration status of parties is not relevant.

Midtrial Bravo moved for reconsideration of the order in limine on the witnesses' immigration status. Bravo's trial attorney, Michael Brodsky, stated that he had overlooked an interview between L.H. and Bravo's previous attorney, where it was discussed that M.H.'s family was in the process for applying for a U visa. Brodsky explained that he may have overlooked it due to a transcription error in the interview transcribing "new visa" rather than "U visa." Brodsky argued that inquiry into the U visa was critical to Bravo's defense because the State's case relied heavily on M.H.'s testimony, and the U visa evidence was necessary in order for him to competently and effectively cross-examine Bravo's main accuser. Brodsky asserted that "continued prohibition on exploration of the U-Visa application would make counsel ineffective and compel a motion to withdraw under RPC 1.7(a)(2) and RPC 1.1."

-4-

The State confirmed that there was a U visa application that was started in 2018 and that the application was not provided in discovery. But the State argued that Bravo had ample time to discover that M.H. and her family were in the U visa application process, so it should not be a basis to relitigate the motion in limine. The State further argued that M.H. did not have knowledge of her immigration process so it would not help the jury. The State also asserted that any theory that M.H. would fabricate the story to pursue a U visa was unfounded because M.H. texted her mom right after the first alleged rape "long before" there was "any pursuit of citizenship that she and her family might have gone through."

The trial court allowed limited inquiry of M.H. as to her knowledge in 2016 at the time she first reported the alleged rape. In its oral ruling, the trial judge explained:

> The Court was able to review some additional authority so I want to put on the record what I reviewed and that's a fairly recent case out of the State Supreme Court [State v. Romero-Ochoa, 193 Wn.2d 341, 440 P.3d 994 (2019)], it's a 2019 case that analyzed a trial court's exclusion of U visa, evidence as it related to motivation to a U visa application. The court, the trial court had excluded that evidence. That case was recognized, that was overturned by Division II and then was recognized by the State Supreme Court ultimately to have been harmless error, but recognized as error in the exclusion of the evidence.

> I do, I see as distinct the motion in limine that was put forth and granted by the Court regarding current immigration status. I see that distinct as an inquiry into motivations for the initial report of the sexual assault.

> What I'm going to do is I'm going to allow the Defense a limited inquiry of [M.H.] regarding her awareness of any immigration process that was happening in 2016 at the time of her report. The Defense will be limited in that inquiry. It will be limited to an exploration of motivations in [M.H.'s] head or not in [M.H.'s] head at the time. That is a way in which the Defense will be given its constitutional guarantee to examine witnesses against them, him, but also reflect the Court's prior rulings on current immigration status and analysis under 403, which I think is appropriately made by Ms. Peach here, that the limited relevance of this evidence,

which would be simply as it motivated the initial report in 2016 and not, given [M.H.]'s answers when she has been talked to about this, has limited relevance beyond that and has a potential to confuse the jury. I think a limited inquiry of [M.H.] under, as to her mental state in 2016, whether she was aware of any immigration process that involved this allegation is sufficient for what the Court thinks should be admissible here under 403.

That's what I'm, I'm not granting any further relief. I don't think this, I think all parties were on notice of this potential issue from the witness interviews that were done. I don't think that motion in limine directly put the Court on notice of the potential issue, but there was plenty of time to further provide amended witness lists and the rest if this was thought to be important. So I'm not going to allow any amendment of witness lists or additional witnesses in the trial and I'm denying the request for a mistrial.

Following the trial court's ruling, Brodsky cross-examined M.H. about her

knowledge of her immigration status in 2016:

[Brodsky]: Going back to when you were living in the shelter in Downers Grove, did you begin any processes down there towards gaining status or documentation or citizenship?

[M.H.]: Not that I remember, no.

[Brodsky]: So you were there, I think you said eight months?

[M.H.]: Yeah.

[Brodsky]: And you never, you're saying you never executed any papers or anything like that?

[M.H.]: No, I only just went to school and took care of, my mom at the time didn't have work, she had surgery.

[Brodsky]: And so did you have discussions with your mother about status and what you guys would do about that?

[M.H.]: No.

[Brodsky]: So were you concerned about that that you didn't have any status and you were just living here and you're not documented?

[M.H.]: I was worried for a while just because I wanted to continue with school.

[Brodsky]: But as far as you know during that eight months that you were at the shelter you took no steps towards executing papers or filings or anything like that?

[M.H.]: No.

[Brodsky]: Did you talk about it with Mr. Valiente?

[M.H.]: Not that I remember, no.

[Brodsky]: Were you aware of what a U visa was at that time?

[M.H.]: No.

[Brodsky]: Are you aware of what one is now?

The State promptly objected to Brodsky's question regarding M.H.'s knowledge of a U visa at the time of trial, the trial judge sustained the objection, and Brodsky did not further inquire.

During cross-examination of M.H.'s sister, L.H., the State objected to questioning about the U visa process. The trial court ultimately sustained the objection stating that whether L.H. knew about a U visa process in 2016 does not go to M.H.'s reporting bias when she spoke with Valiente. The court explained:

> The Court allowed for limited questioning of the complaining witness, [M.H.], yesterday after considering Evidence Rule 413 and also the motions in limine regarding immigration information that should be presented or not be presented to the jury. So I allowed a limited inquiry for the direct purpose of examining bias, if there was bias that was evident at the time of the report in 2016.
>
> I don't find that that same justification is at play with this witness that's here on the stand, [L.H.] Whether she had knowledge or not knowledge or knowledge that was different than [M.H.'s], that doesn't go to the issue of [M.H.'s] reporting bias at the time that she spoke with Sergio in 2016. That would have been examined through the cross-examination through

the questioning of [M.H.] and it was and I allowed that. But it does not expand and I don't think it should expand to the topics that are being addressed here by Mr. Brodsky with this witness.

So I'm going to sustain the objection. I think that the questioning, I'm not seeing that, I allowed for some consideration of questioning of [L.H.] if there were inconsistencies based on her recollection and what [M.H.] testified to, but I'm not hearing that as an independent basis for admission. So I think it's proper to sustain the objection under Evidence Rule 413 in the Court's previous rulings on the motions in limine. So that's the ruling of the Court, I'm going to sustain the objection.

The jury found Bravo guilty on count I, but was unable to reach a verdict on counts II and III. The trial court then declared a mistrial on counts II and III. Bravo was sentenced to 108 months of confinement for count I.

II

Bravo argues that the trial court erred in limiting cross-examination regarding the pending U visa application. We agree.

A

Both the United States and Washington State Constitutions guarantee a defendant's right to present a defense and to confront the witnesses against them. Romero-Ochoa, 193 Wn.2d at 347; U.S. CONST. amend. VI; CONST. art. I, § 22. "'The primary and most important component' of the confrontation right 'is the right to conduct a meaningful cross-examination of adverse witnesses.'" State v. Orn, 197 Wn.2d 343, 347, 482 P.3d 913 (2021) (quoting State v. Darden, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002)). "Cross-examination designed to expose a witness's bias has long been recognized as particularly important because it reveals a 'witness's motivation in

testifying." Orn, 197 Wn.2d at 347 (quoting Davis v. Alaska, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974)).

But the constitutional right of confrontation does not give the defendant an absolute right of cross-examination. State v. Lee, 188 Wn.2d 473, 487, 396 P.3d 316 (2017). It "guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Lee, Wn.2d. at 487 (citing Delaware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985)). Accordingly, trial judges have wide latitude to impose limits on cross-examination based on concerns including "'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" Lee, 188 Wn.2d at 487 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)).

We apply a three-part test to determine whether the trial court exceeded its discretion by limiting cross-examination: "(1) whether the excluded evidence was at least minimally relevant, (2) whether the evidence was so 'prejudicial as to disrupt the fairness of the factfinding process' at trial, and if so, (3) whether the State's interest in excluding the prejudicial evidence outweighs the defendant's need to present it." Orn, 197 Wn.2d at 353 (quoting State v. Hudlow, 99 Wn.2d 1, 15, 659 P.2d 514 (1983)). The first prong is reviewed for abuse of discretion, and if that is met, the second two prongs are reviewed de novo. State v. Clark, 187 Wn.2d 641, 648-49, 389 P.3d 462 (2017).

B

The trial judge limited cross-examination about M.H. and her family's pending U visa application. To obtain a U visa the applicant must:

-9-

(1) "possess specific facts regarding the criminal activity leading a certifying official to determine that the petitioner has, is, or is likely to provide assistance to the investigation or prosecution of the qualifying criminal activity," and (2) [demonstrate that she is] "being helpful, or is likely to be helpful to a certifying agency in the investigation or prosecution of the qualifying criminal activity upon which his or her petition is based, and since the initiation of cooperation, has not refused or failed to provide information and assistance reasonably requested."

Romero-Perez v. Commonwealth, 492 S.W.3d 902, 906 (Ky. Ct. App. 2016) (alteration in original) (citation omitted) (quoting 8 C.F.R. § 214.14(b)(3)). Lastly, qualifying relatives of the victim may be also able to obtain a U-visa. See 8 U.S.C. § 1101(a)(15)(U)(ii)(I).

The trial court excluded evidence of L.H.'s pending U visa application and only allowed inquiry into M.H.'s knowledge of her immigration status at the time she initially reported the incident in 2016. The court did not allow inquiry into M.H.'s status at the time she testified in 2022. The trial court found, under ER 403, that further inquiry beyond when M.H. first reported had limited relevance and had the potential to confuse the jury. Further, there was a juror on the jury who was an immigration attorney, and the parties were concerned about a mistrial if there was more questioning into the U visa.

1

Our Supreme Court recently highlighted the importance of cross-examination to demonstrate potential witness bias:

A witness's bias is "always relevant as discrediting the witness and affecting the weight of [their] testimony." And "the more essential the witness is to the prosecution's case, the more latitude the defense should be given to explore fundamental elements such as motive, bias, [or] credibility."

-10-

Orn, 197 Wn.2d at 353-54 (second alteration in original) (internal quotation marks and citation omitted) (quoting Davis, 415 U.S. at 316; Darden, 145 Wn.2d at 619.)

In Orn, the trial court granted the State's motion in limine to exclude evidence that the State's witness, Thomas Seamans, was a confidential informant. Addressing the first test—relevance—the Supreme Court explained that Seamans was an essential witness for the State. And because the defendant, Nicholas Orn, did not testify, Seamans was the only witness who testified to Orn's conduct and intent. As a result, "Seamans's credibility was critical to the State's ability to prove that Orn premeditated and did not act in self-defense." Orn, 197 Wn.2d at 354. As to Seamans's status as a confidential informant, the court explained:

> Evidence of bias is particularly probative of a witness's credibility when it stems from a witness's motive to cooperate with the State based on the possibility of leniency or the desire to avoid prosecution. Such evidence serves as a "more particular attack on the witness' credibility" because it exposes a witness' motivation in testifying.

Orn, 197 Wn.2d at 254 (citations omitted) (quoting Davis, 415 U.S. at 316). The Supreme Court found the trial court abused its discretion on the evidentiary ruling, which violated Orn's Sixth Amendment rights. Orn, 197 Wn.2d at 358-59. The error was ultimately deemed harmless, however, in light of the wealth of other uncontroverted evidence linking Orn to the crime. Orn, 197 Wn.2d at 360.

In State v. Carballo, 17 Wn. App. 2d 337, 486 P.3d 142 (2021), this court addressed the admissibility of a witness's immigration status to demonstrate bias. We held that the trial court committed error in violation of the defendant's Sixth Amendment right to cross-examination and to present a defense, when it refused to allow the defendant to cross-examine the State's key witness about her immigration status.

Carballo, 17 Wn. App. 2d at 355. The defense argued that the defendant had a constitutional right to cross-examine the State's key witness to expose bias and motive to fabricate. Carballo, 17 Wn. App. 2d at 345. We agreed and reasoned, "[t]he ability to provide the motive to fabricate after the key witness admits to being untruthful is critical for the defense in a case in which the State's theory relied so heavily on that witness' credibility." Carballo, 17 Wn. App. 2d at 354. See also State v. Bedada, 13 Wn. App. 2d 185, 205, 463 P.3d 125 (2020) (finding the trial court committed error by excluding immigration status because "[d]emonstrating bias on the part of the key witness has long been deemed an important element of a defendant's right to present a defense.").

Here, like Orn and Carballo, inquiry into M.H.'s U visa status was relevant. Both M.H. and L.H. stood to obtain a pathway to citizenship through their testimony and help to the prosecution. M.H. was a victim of a qualifying crime, and L.H. was a qualifying relative who could receive a U visa. There was no inquiry into the possible bias or interest from M.H. and L.H.'s testimony. Perhaps L.H. may have only testified in order to obtain a U visa. It is also possible that M.H. could have continued to help the prosecution from 2016 to the trial date solely for obtaining a U visa. It is also possible that M.H. could have been pressured by her family to continue to help the prosecution so that her family could have been able to obtain a U visa. None of these theories could be discovered.

As our Supreme Court recognized in Romero-Ochoa, "prosecution witness's U visa application could, given the right set of facts, support a defense theory milder than outright fraud" and the U visa incentive structure could lead a witness merely to "embellish allegations rather than fabricate them out of thin air." 193 Wn.2d at 362

(citing Romero-Perez, 492 S.W.3d at 906-07) ("Even if the victim did not outright fabricate the allegations against the defendant, the structure of the [U visa] program could cause a victim to embellish her testimony in the hopes of being as 'helpful' as possible to the prosecution.")

Inquiry into the U visa may not have necessarily revealed that M.H. outright invented the allegations. Rather, the structure of the U visa program can encourage some victims to be as helpful as possible to the prosecution in order to obtain citizenship. This could have motivated either M.H. or L.H. to embellish their stories and allegations. The evidence was relevant.

2

Because the evidence of M.H.'s and L.H.'s potential bias exceeds the threshold of minimum relevance, it could be excluded only if the State showed "a compelling interest to exclude prejudicial or inflammatory evidence." Darden, 145 Wn.2d at 621. "To justify exclusion, the State must show that the evidence is 'so prejudicial as to disrupt the fairness of the factfinding process.'" Orn, 197 Wn.2d at 355 (quoting Hudlow, 99 Wn.2d at 15).

The State did not make that showing here. In its pretrial motion in limine, the State offered only that the evidence was irrelevant and "incredibly prejudicial and would confuse or mislead the jury." In response to Bravo's midtrial motion for reconsideration, the State focused its opposition on the need to bring in a witness to explain the U visa process, and on the potential need to either dismiss a sitting juror with immigration experience or declare a mistrial. While undeniably an inconvenience to bring in an additional witness, or to declare a mistrial on the fourth day of a 10-day trial, the State

did not meet its burden of demonstrating a compelling interest in excluding prejudicial or inflammatory evidence. Orn, 197 Wn.2d at 355.

3

Because the State did not meet its burden of demonstrating a compelling interest in excluding the evidence, we need not examine the final factor—whether the State's interest in excluding the evidence outweighed Bravo's need to introduce the evidence. But even if the State could show such prejudice, the relevance of M.H.'s U visa status outweighs any prejudice. M.H. was the sole accuser and key witness. "A defendant enjoys more latitude to expose the bias of a key witness." Bedada, 13 Wn. App. 2d at 205 (quoting State v. Fisher, 165 Wn.2d 727, 752, 202 P.3d 937 (2009)). Bravo was only permitted questioning into when M.H. first reported. This did not allow exposure of any potential bias and interest in remaining helpful to the prosecution from 2016 to the trial date. L.H. may also have benefitted through providing her testimony, but Bravo could make no inquiry into her potential bias.

The prejudice and potential of confusing the issues is outweighed by the relevance. The case centered on M.H.'s credibility. If she or her family stood to greatly benefit from her testimony or her help over the years before trial, Bravo should have been able to question their motive to testify. The fact that there could have been a mistrial or a "mini-trial" over immigration does not outweigh Bravo's constitutional right to meaningfully cross-examine the key witness against him.

We conclude that the trial court erred in limiting cross-examination of M.H. and L.H. about their U visa status.

B

1

Violations of the right to present a defense and confront witnesses at trial are subject to a constitutional harmless error review. Romero-Ochoa, 193 Wn.2d at 347 (citing Van Arsdall, 475 U.S. at 684). The State bears the burden of proving the error is harmless beyond a reasonable doubt. State v. Coristine, 177 Wn.2d 370, 380, 300 P.3d 400 (2013). "An error is harmless and not grounds for reversal if the appellate court is assured beyond a reasonable doubt that the jury would have reached the same verdict without the error." Romero-Ochoa, 193 Wn.2d at 347. As our Supreme Court has summarized:

> In the context of an erroneous exclusion of impeachment evidence, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, [we can] nonetheless say that the error was harmless beyond a reasonable doubt." Consistent with our overwhelming untainted evidence test, this inquiry requires us to find the error harmless if, in light of the entire trial record, we are convinced that the jury would have reached the same verdict absent the error. Relevant considerations include the properly admitted direct and circumstantial evidence (i.e., the strength of the State's case and the plausibility of the defense theory) and the overall significance of the erroneously admitted or excluded evidence in this context (e.g., whether it was cumulative or corroborated, or consistent with the defense theory).

Romero-Ochoa, 193 Wn.2d at 348 (alterations in original) (citation and footnote omitted) (quoting Van Arsdall, 475 U.S. at 684).

Romero-Ochoa was charged with burglary, unlawful imprisonment, assault, and rape, arising from an incident in which he broke into a woman's home. Romero-Ochoa, 193 Wn.2d at 343-44. At trial, Romero-Ochoa sought to admit evidence that the victim had applied for a U visa in connection with these crimes, but the trial court excluded the

evidence. Romero-Ochoa, 193 Wn.2d at 344. Romero-Ochoa appealed on the ground that the exclusion of U visa evidence violated his constitutional right to present a defense. Romero-Ochoa, 193 Wn.2d at 344. Division Two of this court held that the trial court's exclusion of the victim's pending U visa application violated Romero-Ochoa's Sixth Amendment right to present a defense and to confront witnesses and that it was constitutional error. Romero-Ochoa, 193 Wn.2d at 346-47.

The State petitioned for review but did not challenge the trial court's holding on the admissibility of the U visa evidence. Instead, it argued that the error was harmless. Our Supreme Court accepted review and reversed, finding while the exclusion was error, it was harmless. Romero-Ochoa, 193 Wn.2d at 361. The court reasoned that the untainted evidence of the defendant's guilt was overwhelming, including corroborating evidence from neighbors who heard commotion, the victim's contemporaneous reporting of her attack, her consistent accounts, and signs of physical injury. Romero-Ochoa, 193 Wn.2d at 360-61.

2

At the outset, the State fails to address, much less meet, its burden of proving harmless error. The State asserts only that "[t]he Jury had sufficient testimony to judge [M.H.'s] credibility and whether she had a motive to lie." This conclusory statement falls short of meeting the high burden required to prove constitutional harmless error.

Our inquiry requires that we first "assume that the damaging potential of the cross-examination were fully realized." Romero-Ochoa, 193 Wn.2d at 348. Here, this means that we assume the defense was able to question M.H. about her pending U visa application at the time of her trial testimony. Based on defense counsel's offer of proof,

-16-

as of August 2021—14 months before trial—both M.H. and L.H. had a pending U visa application based on domestic violence and sexual assault. The State verified that a U visa application based on domestic violence and sexual assault was applied for in 2019. Evidence of a pending U visa application could have allowed Bravo to at least argue a motive to "embellish allegations" against him at trial. Romero-Ochoa, 193 Wn.2d at 362.

Here, Unlike Romero-Ochoa, there was only limited corroborating evidence for M.H.'s testimony. There were no contemporaneous corroborating witnesses and M.H.'s first report was not contemporaneous, but five years later. There was also no physical evidence. Cf. Romero-Ochoa, 193 Wn.2d at 360-61. Thus, M.H.'s credibility was critical.[4]

There were also inconsistencies between M.H.'s first report to Valiente in 2016, and her trial testimony. For example, Valiente testified about M.H.'s report of one incident of rape that occurred in the apartment she shared alone with Bravo. At trial M.H. testified that she was raped first on a mattress at the Bravo's aunt and uncles' home, and then twice more in the apartment she later shared with Bravo.

And while M.H. testified that she sent a text message right after the event to her mother, and Bravo agreed he had seen a message, this evidence is not so overwhelming that we can conclude, beyond a reasonable doubt, that the jury would have reached the same verdict had it heard evidence of pending U visa applications for M.H. and L.H.

---

[4] We note that the jury was also unable to reach a verdict on two of the three charges, suggesting potential concern with M.H.'s credibility—even without the jury knowing of a possible pending U visa application.

And finally, the State's closing argument emphasized that M.H. had no reason to fabricate:

> I want you to think about [M.H.] and what her motivations are in this process, what they could possibly be. She has no motive to fabricate sexual assault allegations against Mr. Bravo.

(Emphasis added.) The prosecutor also discussed L.H. having no bias:

> [L.H.] has no motive to fabricate anything in this case. She isn't close to Mr. Bravo, she doesn't seem to have strong feelings from her time with him, Mr. Brodsky asked about him not responding to an e-mail inviting him to graduation and she didn't really seem to care.

The State's closing argument emphasized that M.H. and L.H. demonstrated no bias and had no motive to fabricate. But Bravo was not able to cross-examine and expose any motive for bias or motive to fabricate, so the jury was unaware of their motives. Because of the State's closing argument, lack of corroborating evidence, and inconsistencies in testimony, assuming the "damaging potential of cross-examination were fully realized" we cannot "nonetheless say that the error was harmless beyond a reasonable doubt." Romero-Ochoa, 193 Wn.2d at 348.

We reverse Bravo's conviction and remand for a new trial.

_____
Mann, J.

WE CONCUR:

_____
Feldman, J.

_____
Smith, C.J.

-18-