IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 12, 2025 Session

## STATE OF TENNESSEE v. BAEHO SHIN

**Appeal from the Criminal Court for Davidson County**
**No. 2019-A-504     Mark J. Fishburn, Judge**

_____

### No. M2024-00835-CCA-R3-CD

_____

A Davidson County jury found the Defendant, Baeho Shin, guilty of especially aggravated kidnapping, aggravated sexual battery, and domestic assault, among other offenses. Thereafter, the trial court imposed an effective sentence of twenty-two years' incarceration. On appeal, the Defendant contends that the trial court violated his constitutional right to confrontation. More specifically, he argues that the court prohibited him from cross-examining the victim about her potential interest in obtaining a U visa, which is a non-immigrant visa available to certain victims of crime. Although the trial court later allowed the Defendant to recall the victim and question her on the topic, he argues that the delayed timing of the examination rendered the remedy inadequate and prejudicial. Upon our review, we conclude that the trial court acted within its discretion in controlling the scope and timing of the cross-examination and that any possible error was harmless beyond a reasonable doubt. We respectfully affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed**

TOM GREENHOLTZ, J., delivered the opinion of the court, in which J. ROSS DYER and JILL BARTEE AYERS, JJ., joined.

Peter J. Strianse (on appeal) and Brent O. Horst (at trial), Nashville, Tennessee, for the appellant, Baeho Shin.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Lody R. Powers, Brian Ewald, and Tammy H. Meade, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND

### A.    THE VICTIM'S ABUSE AND ESCAPE

The Defendant and the victim met in 2015 or 2016 after the victim, a South Korean national, sent him an unsolicited Facebook message. At the time, the victim was in the United States on a visitor visa set to expire in January 2019. The two communicated online for several years before meeting in person, after which the victim began visiting the Defendant at his home in Nashville. In November 2018, she began living with him intermittently.

The relationship between the Defendant and the victim deteriorated in late December 2018. According to the victim's later testimony at trial, she was the victim of a series of assaults that occurred between December 24 and December 30, 2018, while she was living at the Defendant's residence in Nashville. She stated that the Defendant physically struck her, restricted her access to communication devices, and subjected her to repeated threats and demeaning conduct. On one occasion, the Defendant accompanied her to a dental appointment, during which she concealed her injuries with makeup and a scarf. The dentist later testified that her injuries appeared to be traumatic in nature.

On December 30, the Defendant refused to allow the victim to leave the apartment. However, she located a set of keys in the Defendant's bag and escaped the residence. The victim fled into the street, where a passing motorist picked her up and transported her to the hospital.

After receiving medical treatment, the victim reported the events to law enforcement, prompting a criminal investigation. On March 8, 2019, a Davidson County grand jury indicted the Defendant on nine counts: one count of especially aggravated kidnapping, two counts of aggravated rape, one count of aggravated sexual battery, four counts of aggravated assault, and one count of domestic assault. The case proceeded to trial in January 2020.

## B. EVIDENTIARY DISPUTE REGARDING U VISA CROSS-EXAMINATION

One of the central evidentiary issues at trial concerned the Defendant's attempt to cross-examine the victim about her potential interest in obtaining a U visa—a non-immigrant visa available to certain victims of crime. *See* 8 U.S.C. §§ 1101(a)(15)(U). The Defendant asserted that this line of questioning was relevant to the victim's credibility and alleged that the U visa gave the victim a motive to fabricate the offenses. The State objected, and the trial court conducted a series of jury-out hearings to determine whether such cross-examination would be permitted.

During the initial jury-out hearing, a victim-witness coordinator for the Davidson County District Attorney's Office testified that her office typically receives and maintains certification forms required for U visa applications. She stated that she had searched the office's database and found no certification or documentation indicating that the victim had applied for or initiated a U visa request.

The victim also testified outside the presence of the jury. She stated that she first learned about the U visa process after the events in question and had never applied for one. She further testified that she had not retained an attorney to assist with a U visa application and did not intend to remain in the United States after the trial. At the time of her testimony, she was residing in South Korea and had returned to the United States solely to testify.

Following this testimony, the trial court initially ruled that cross-examination concerning the U visa would not be permitted. The court reasoned that there was insufficient evidentiary foundation to establish that the victim had applied for or was actively pursuing a U visa. As such, it concluded that any questioning on the subject would be speculative and irrelevant.

Later in the trial, the Defendant supplemented his offer of proof with audio recordings recovered from his home security system, which allegedly captured the victim discussing the need to cooperate with the District Attorney's Office to obtain a U visa. Based on this new evidence, the trial court revisited its earlier ruling. After listening to the recordings and reviewing additional case law, the court found that the defense had established a sufficient factual basis to pursue this line of questioning. Although the court ruled that the recordings themselves were not independently admissible, it permitted the Defendant to recall the victim before the jury and question her about her knowledge of, and potential interest in, a U visa.

3

On recall, the victim acknowledged that she was not a United States citizen and that she was aware of the existence of U visas. She testified that someone had advised her that she might be eligible for one and encouraged her to pursue it, but she had not decided whether to apply. She confirmed that she understood a U visa could allow her to remain in the United States legally, but reiterated that she had never applied for one.

The Defendant also testified in his own defense and denied assaulting the victim. He stated that, after discussing a possible breakup with her on December 30, 2018, he went to bed and later discovered that she had left while he was sleeping.

He also admitted that, following his arrest, he contacted the victim and instructed her on what to include in recantation statements submitted to law enforcement. He denied threatening her but acknowledged telling her what to write, including that she had fabricated the allegations out of jealousy. The victim ultimately submitted a written recantation, which the State introduced at trial and argued had been coerced.

### C.    Verdict, Sentencing, and Appeal

At the conclusion of the trial, the jury found the Defendant guilty of especially aggravated kidnapping, aggravated sexual battery, three counts of aggravated assault, and domestic assault with bodily injury. The jury acquitted the Defendant of the remaining counts, including both charges of aggravated rape. Following a sentencing hearing held on February 23, 2023, the trial court imposed an effective sentence of twenty-two years' incarceration.

On March 24, 2023, the Defendant filed a timely motion for a new trial, arguing that the trial court violated his constitutional rights by prohibiting cross-examination of the victim regarding her potential interest in applying for a U visa. The trial court denied the motion in a written order entered on May 10, 2024. The Defendant filed a timely notice of appeal twenty-eight days later. *See* Tenn. R. App. P. 4(a).

### STANDARD OF APPELLATE REVIEW

Our supreme court has recognized that "the first question for a reviewing court on any issue is 'what is the appropriate standard of review?'" *State v. Enix*, 653 S.W.3d 692, 698 (Tenn. 2022). The sole issue in this appeal is whether the trial court improperly

4

restricted the Defendant's cross-examination of the victim about her interest in applying for a U visa. This court has recognized that "[t]he propriety, scope, manner, and control of the cross-examination of witnesses rests within the sound discretion of the trial court." *State v. Hardison*, 680 S.W.3d 282, 315 (Tenn. Crim. App. 2023). "The trial court abuses its discretion by unreasonably restricting a defendant's right to cross-examine a witness against him." *State v. Echols*, 382 S.W.3d 266, 285 (Tenn. 2012).

## ANALYSIS

On appeal, the Defendant argues that the trial court violated his constitutional right to confrontation by initially barring cross-examination of the victim about her potential interest in obtaining a U visa. Although the court later allowed the Defendant to recall the victim during his case-in-chief, he asserts that this procedure deprived him of the opportunity to challenge her credibility immediately after her direct testimony. He further contends that the error was not harmless because the victim's alleged motive to fabricate was central to his defense.

The State responds that the trial court properly excluded the cross-examination initially due to a lack of evidentiary foundation. After the Defendant introduced audio recordings supporting his theory, the court revisited its ruling and permitted him to recall the victim and question her on the issue. The State maintains that the Defendant's examination was unrestricted and that any error in timing was harmless beyond a reasonable doubt. We agree with the State.

### A. RIGHT TO CROSS-EXAMINE WITNESSES

Both the United States and Tennessee Constitutions guarantee a criminal defendant the right to confront and cross-examine witnesses brought against him or her. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. As part of this right, a defendant may seek to impeach a witness by eliciting evidence of bias. *See* Tenn. R. Evid. 616; *see also State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001). Impeachment questions, however, must be reasonably calculated to elicit relevant evidence, and the right to cross-examination "does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994); *Hardison*, 680 S.W.3d at 315 (same); *see also* Tenn. R. Evid. 611(a).

5

In this case, the Defendant sought to cross-examine the victim about a potential interest in applying for a U visa. A U visa is a type of federal immigration benefit available to certain noncitizens who have been victims of qualifying crimes, including domestic violence. *See* 8 U.S.C. §§ 1101(a)(15)(U), 1184(p). If granted, a U visa allows the recipient to lawfully remain in the United States for up to four years and may lead to lawful permanent residency after three years of continuous presence. *See* 8 U.S.C. §§ 1184(p)(6), 1255(m); *see also State v. Gonzales*, No. W2017-00941-CCA-R3-CD, 2018 WL 5098204, at *15 (Tenn. Crim. App. Oct. 18, 2018), *perm. app. denied* (Tenn. Feb. 25, 2019).

To qualify, the applicant must demonstrate that they have been, or are likely to be, helpful to law enforcement in investigating or prosecuting criminal activity. *See* 8 C.F.R. § 214.14(b); *see also* U.S. Citizenship and Immigration Services, *Victims of Criminal Activity: U Nonimmigrant Status*, *available at* https://perma.cc/9MEA-HXP2 (last visited August 21, 2025). Because the program ties immigration benefits to cooperation with law enforcement, courts have recognized a potential incentive for witnesses to exaggerate their testimony to appear more "helpful." *See, e.g.*, *State v. Juan A. G.-P.*, 287 A.3d 1060, 1083 (Conn. 2023) (observing that "[w]ith very few exceptions," courts have held that a witness's efforts to obtain a U visa are necessarily relevant to bias, interest, or motive for testifying).

Here, the trial court initially allowed the Defendant to question the victim about the U visa outside the jury's presence. The victim testified that she learned about U visas only after the alleged events, that she had never applied for one, and that she intended to return to South Korea following the trial. Additionally, a representative from the District Attorney's Office confirmed that no U visa certification had been issued for the victim—a prerequisite for receiving a U visa. *See* 8 U.S.C. § 1184(p)(1); 8 C.F.R. § 214.14(c)(2)(i).

Thus, despite offering the Defendant an opportunity to lay a foundation for future cross-examination, the Defendant developed no evidence that the victim had sought immigration relief in connection with her testimony. The mere existence of the U visa program does not, without more, support an inference that a witness had a motive to fabricate. Instead, relevance turns on whether the witness was aware of the immigration benefit and had an intent to pursue it at the time of the initial report or thereafter. *Cf. Gonzales*, 2018 WL 5098204, at *15 (recognizing relevance to impeachment for bias involving the victim's mother, who had applied for a U visa, and for another witness, who had an arguable motive to help the mother's pending application); *State v. Hernandez*, 344 P.3d 538, 543 (Or. Ct. App. 2015) (noting as correct the argument that "[t]he complainant's intent to actually seek a U–Visa implicates a level of bias and incentive that is greater than

6

the fact that at some point she merely learned she had the ability to do so. . . . Such an intent would indicate a greater motive to fabricate than a mere unrealized and hypothetical possibility." (omission in original)). On this record, the trial court did not abuse its discretion in restricting cross-examination at that stage of the trial.

The evidentiary landscape shifted when the Defendant later introduced audio recordings that appeared to capture the victim discussing the possibility of applying for a U visa. After reviewing this new material, the trial court acknowledged that it had not previously seen or heard the recordings and reconsidered its earlier ruling. In one recording, the victim seemed to confirm that she had discussed the U visa process with others and had been encouraged to pursue it. This new evidence provided a factual basis for the Defendant's proposed line of questioning. In response, the court permitted him to recall the victim and examine her on the subject. That decision was well within the court's discretion. *See State v. Bravo*, 563 P.3d 1068, 1076 (Wash. Ct. App. 2025) (noting that while a U visa inquiry may not prove fabrication, it can reveal incentives to embellish testimony to appear more helpful to prosecutors).

In pushing against this conclusion, the Defendant cites two cases in support of his argument that the court erred in initially limiting his cross-examination: *Gonzalez v. State*, 316 A.3d 484 (Md. 2024), and *Romero-Perez v. Commonwealth*, 492 S.W.3d 902 (Ky. Ct. App. 2016). But those cases are of little help here. In each case, the trial court entirely prohibited cross-examination regarding a witness's pursuit of a U visa, despite the record containing clear, contemporaneous evidence that the witness had applied for the visa. In *Gonzalez*, the victim's attorney had contacted the prosecution and helped complete the application, which included a signed law enforcement certification and which was pending at the time of trial. *Gonzalez*, 316 A.3d at 494-95, 510. Similarly, in *Romero-Perez*, the victim's U visa application had already been submitted and awaited only judicial signature. *Romero-Perez*, 492 S.W.3d at 904, 907.

The immigration incentive in those cases was not merely hypothetical. It was actively pursued and supported by documentation. As such, the reviewing courts held that the restriction on cross-examination violated the defendants' confrontation rights because it blocked a relevant line of impeachment.

By contrast, the Defendant's proof here initially showed no indication that the victim had applied for a U visa or even intended to remain in the country. Moreover, unlike in *Gonzalez* and *Romero-Perez*, the trial court here did not bar the questioning outright. The

7

court merely postponed it until a factual foundation had been laid and then permitted full examination by leading questions when that foundation emerged.

Our system entrusts trial courts with the responsibility to weigh confrontation rights against the need to keep speculative or irrelevant evidence from the jury. *See Reid*, 882 S.W.2d at 430; *Hardison*, 680 S.W.3d at 315. The exercise of that duty can sometimes be challenging, particularly when rulings must be made mid-trial and on a shifting evidentiary record. But the trial court here acted with deliberate care. It excluded irrelevant inquiry until a factual basis was shown and allowed full cross-examination once it was. The Constitution requires no more.

## B.    HARMLESS ERROR ANALYSIS

Although we have determined that the trial court acted within its discretion in limiting the initial cross-examination, we also conclude that any potential error in doing so would have been harmless beyond a reasonable doubt. Tennessee law recognizes three categories of error: (1) structural constitutional error, which requires automatic reversal; (2) non-structural constitutional error, which is subject to constitutional harmless error review; and (3) non-constitutional error, which is subject to a less demanding harmlessness standard. *See State v. Climer*, 400 S.W.3d 537, 569 (Tenn. 2013) (citing *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). A limitation on cross-examination implicates the constitutional right to confrontation, but it constitutes a non-structural constitutional error and does not require automatic reversal. *See State v. Howell*, 868 S.W.2d 238, 253 (Tenn. 1993). The applicable standard is whether the State has demonstrated "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Rodriguez*, 254 S.W.3d at 371 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

When determining whether a limitation on impeachment was harmless, a reviewing court asks "whether, assuming that the damaging potential of the cross-examination were fully realized, the error was nonetheless harmless beyond a reasonable doubt." *Howell*, 868 S.W.2d at 253 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). Relevant considerations to this inquiry include: (1) the importance of the witness's testimony to the State's case; (2) the cumulative nature of the testimony; (3) the presence or absence of corroborating or contradicting evidence on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. *See id.*

Tennessee courts have applied these standards in cases involving restrictions on asking a victim about a U visa. *See, e.g.*, *Gonzales*, 2018 WL 5098204, at *16. Guided by these principles, we conclude that any error here is clearly harmless beyond a reasonable doubt for the following reasons.

First, the trial court ultimately allowed the Defendant to recall the victim and question her at length regarding her knowledge of U visas, her intent to apply, her understanding of the benefits associated with the visa, and whether others were working on her behalf. Nothing in the record suggests that the court limited the scope or depth of this recall testimony. Indeed, the Defendant used the opportunity to explore the precise topics he claimed were improperly excluded during the State's case-in-chief.

Second, the record is devoid of any evidence that the victim had filed a U visa application, obtained law enforcement certification, or retained legal counsel for that purpose. Although the Defendant later introduced recordings in which the victim discussed the possibility of applying, those statements did not contradict her in-court testimony. Rather, the recordings suggest only that she may have considered applying at some point after reporting the offenses—not that she harbored an immigration-related motive when she initially contacted the police. While this testimony was relevant to potential bias, the speculative nature of the impeachment substantially limited its probative force.

Third, although the questioning occurred during the Defendant's case-in-chief, rather than immediately following the victim's direct testimony, the timing did not render the cross-examination ineffective. The Defendant identifies no prejudice attributable to the delay. He does not claim that any relevant questions were foreclosed or that the jury was less receptive to the evidence because of its timing. Whatever benefit he sought from the inquiry, he received. Under the law, that is sufficient. *See State v. Kibodeaux*, 680 S.W.3d 320, 330 (Tenn. Crim. App. 2023) (recognizing that the Confrontation Clause guarantees "only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish[.]" (citation and internal quotation marks omitted)).

Nor does the record support the Defendant's contention that the trial court improperly shifted the burden of proof. The court did not prohibit the Defendant from questioning the victim about potential immigration motives; it merely required a proper evidentiary foundation before permitting that line of inquiry. The Defendant already possessed the audio recordings that provided such a foundation, but chose not to introduce

9

them until later in the trial.  That delay—not any judicial ruling—postponed the related cross-examination.  Once the recordings were presented, the court promptly reconsidered its ruling and allowed the Defendant to recall the victim for further questioning.  The delay, in short, was not the product of judicial error but of the Defendant's own timing in bringing the recordings to the court's attention.  That the examination occurred during the defense case does not render the ruling constitutionally infirm.  *See Sayles*, 49 S.W.3d at 280.

Finally, the broader evidentiary record undermines any claim of prejudice.  The victim's testimony was corroborated by physical evidence, medical findings, and the Defendant's own statements, including his admission that he instructed the victim to recant.  Against that backdrop, the marginal impeachment value of the U visa evidence—even if fully credited—could not have affected the jury's verdict.

In short, this is not a case in which the jury was deprived of critical information or the defense was prevented from presenting its theory.  The trial court carefully balanced the rules of evidence with the Defendant's constitutional rights and, once a proper foundation was established, permitted full cross-examination.  The record reflects that the Defendant was afforded a meaningful opportunity to examine the victim on the subject.  Any delay in that opportunity did not impair the fairness of the trial and was harmless beyond a reasonable doubt.

## CONCLUSION

In summary, we hold that the trial court acted within its discretion in initially limiting cross-examination due to the absence of a proper evidentiary foundation.  Once the Defendant presented evidence establishing relevance, the court appropriately allowed further examination.  Any error in timing was harmless beyond a reasonable doubt, as the Defendant ultimately conducted a full and unrestricted examination of the victim on recall.  Accordingly, we respectfully affirm the judgments of the trial court.

s/ *Tom Greenholtz*
TOM GREENHOLTZ, JUDGE