IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 82054-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| CESAR CHICAS CARBALLO, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — Cesar Chicas Carballo and his co-defendant were both convicted of first degree murder and conspiracy to commit first degree murder following a joint jury trial. The co-defendant's girlfriend was the key witness in the State's case and provided a detailed account of the crime and its planning. Requests from both defendants to cross-examine her about her immigration status as it related to a possible motive to lie were considered in the context of ER 413, but denied. Chicas Carballo appealed, arguing the court improperly allowed un-redacted statements by his co-defendant in violation of Chicas Carballo's right to confrontation under United States v. Bruton.[1] He further asserts that the denial of his request to explore immigration matters as to this critical witness violated his Sixth Amendment right to present a defense. Because the court's rulings on the

---

[1] 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).

ER 413 issue constitute reversible error, we need not reach Chicas Carballo's other challenges on appeal. We reverse and remand for a new trial.

FACTS

In April of 2016, a couple saw a body on a street in Tacoma and called 911. Police responded to the area soon after and located a man, later identified as Samuel Cruces Vasquez, bleeding heavily, but alive. There was a sport utility vehicle (SUV) parked nearby that was still running with its driver door open and blood inside the vehicle. There was also a butterfly knife on the ground, blue latex gloves inside the SUV, and a shoe pinched between the SUV and another vehicle. Cruces Vasquez was later pronounced dead at the hospital.

About three weeks after the incident, a witness contacted police and told them what he had observed. The witness explained that he was driving when someone exited a car and signaled for him to stop. He stated that he kept driving out of safety concerns. He looked in his rearview mirror as he drove away and saw two people emerge from the vehicle. He said one of them beat the person who had signaled him to stop.

Surveillance footage from a nearby business captured some of the events that night. In one video, a woman, later identified as Mayra Karina Calderon Flores,[2] could be seen walking on the street and another individual later walked to the SUV. After that, there appeared to be movement inside the SUV. Cruces Vasquez could be seen exiting the SUV and was then run over by an unidentified

---

[2] Ms. Calderon Flores is referred to as Flores throughout the record. For clarity, we will use that portion of her last name to identify her as well.

car. The autopsy revealed Cruces Vasquez had been stabbed eight times and suffered blunt trauma injuries. Blood from the knife found on the ground matched Cruces Vasquez's DNA[3]. The shoe located between the vehicles was connected to Jose Jonael Ayala Reyes by his own admission and DNA from inside a latex glove found in the vehicle was identified as that of another man involved in the incident. None of the physical evidence collected in the case was linked to Cesar Chicas Carballo.

Investigation determined that Cruces Vasquez had clocked out of work at 10:10 p.m. on the night of the crime and that he had received numerous calls and texts from Ayala Reyes' phone number. Ayala Reyes and Cruces Vasquez had worked together at a pizza restaurant. Earlier in April, Cruces Vasquez' brother helped Ayala Reyes get a bus ticket to California. Ayala Reyes had told Cruces Vasquez' brother that he was in the MS-13[4] gang and that he provided money to people in California when he received his paychecks. He said the amounts were around $20 or $30. Ayala Reyes claimed the money was later sent by the gang members in California to El Salvador.

Ayala Reyes was taken into custody in July 2016. He admitted to being one of a number of participants in the stabbing of Cruces Vasquez, but didn't provide names of the others involved. Ayala Reyes acknowledged the knife found at the scene was his and that he had stabbed Cruces Vasquez one time in the leg, but denied killing him. He also claimed that Cruces Vasquez sold drugs.

---

[3] Deoxyribonucleic Acid.
[4] Mara Salvatrucha 13.

Ayala Reyes was dating Flores. Flores was also questioned by police about the stabbing. After extensive police interrogation, Flores provided the street names of the individuals involved: Sombra, Tas, and Sicario. After police showed her a photo of Chicas Carballo, Flores identified him as the individual named Tas. Flores' identification of the suspects by name and photograph, and the further explanations she provided, did not occur until police threatened to arrest her and indicated she might be removed from the United States if she didn't tell them what occurred. Flores similarly identified Juan Jose Gaitan Vasquez as Sombra. The DNA from the blue gloves recovered at the crime scene was linked to Gaitan Vasquez and he separately pleaded guilty to charges stemming from Cruces Vasquez' death. A detective with the Tacoma Police Department later identified Sicario as Edenilson Misael Alfaro.

At trial, Flores testified that Ayala Reyes sent money to Sicario to support gang activity. She explained that he sent the money "[b]ecause of drugs . . . [Ayala Reyes] had" and she later turned over money transfer receipts to law enforcement. The receipts indicated that Ayala Reyes wired money to Chicas Carballo in California in amounts of $200, $300, and $260 on June 6, 25, and July 7 of 2016.

Flores testified that Ayala Reyes rented an apartment in April 2016 and that she was present in the apartment when she heard him talking with Tas, Sombra, and Sicario about killing Cruces Vasquez. Flores claimed that all of the individuals involved were members of MS-13. She described Sicario as the "main one." Flores had never seen Sicario prior to the date she heard them discussing the plan. She further testified that Ayala Reyes went to California a few weeks before the

killing and met with Sicario because of drugs. She asserted that the apartment had been rented when Ayala Reyes returned from California specifically so that gang members could come there, but that it was also intended as the residence for her and Ayala Reyes.

Flores said on the day of the attack on Cruces Vasquez, Ayala Reyes was picked up by three men in a truck. She later went to the apartment and, while cooking for them, heard the four men discussing how they would kill Cruces Vasquez. She testified that Sombra said he was going to stab Cruces Vasquez. Ayala Reyes was to lure Cruces Vasquez by calling him. Flores claimed that Ayala Reyes and Sombra were to do the killing because they were not in the gang. The men grabbed gloves provided by Ayala Reyes. Flores said she had seen two knives; one a butterfly knife and the other a knife that Sombra passed around. The four men and Flores left the apartment to go to the location where the killing was to occur. She indicated that Chicas Carballo was the driver. Flores said that when the men left to meet Cruces Vasquez the night of the attack, she initially rode with them, but was dropped off before they reached their destination and she walked home.

Later that night, Flores went to the apartment to meet Ayala Reyes and saw Tas, Sombra, and Sicario leave in their vehicle. She observed blood on the passenger side door. Ayala Reyes recounted the killing to Flores claiming he stabbed Cruces Vasquez in the leg, that Sombra stabbed him in the neck, and that they beat him on the street, ultimately killing him. Flores thought the killing was

because Cruces Vasquez sold drugs and that Ayala Reyes had killed him to be part of "La Mara."

In March of 2017, Chicas Carballo was interrogated by law enforcement in California. He maintained that he drove to Washington with two others based on an offer of a construction job. Chicas Carballo stated that he did not remember the specifics as to the timing or precise destination of the trip to Washington. He indicated one of the men was named "Juan," "Jose," or "Juan Jose," and that he met this man at MacArthur Park in Los Angeles when he was looking for work. He stated that he did not know the other individual who rode with them in the car and that when they arrived in Washington, Juan/Jose repeatedly called the man who was offering the construction job. Chicas Carballo said at one point he was told to wait in the car and that Juan/Jose left and came back, reporting that he could not reach the man offering the work. He said that the three men then went back to California. Chicas Carballo asserted that he had been tricked into going to Washington for work and denied knowing anything about the killing.

After denial of motions to sever their cases, Chicas Carballo and Ayala Reyes proceeded to a joint trial as co-defendants. Chicas Carballo's defense theory was that Flores lied and that the State had failed to prove beyond a reasonable doubt that he was involved in the killing. The jury returned guilty verdicts on all counts for both Chicas Carballo and Ayala Reyes.[5][6] The jury also

---

[5] This included a separate count of second degree felony murder, which was later vacated on double jeopardy grounds.

[6] This court recently affirmed Ayala Reyes' convictions in an unpublished opinion. State v. Ayala Reyes, No. 81393-5-I (Wash. Ct. App. July 27, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/813935.pdf.

returned special verdicts concluding that a deadly weapon was used in the commission of the crimes and finding a gang aggravator for the offenses. The court did not impose an exceptional sentence for Chicas Carballo based on the gang aggravator, but did impose a total of 608 months confinement, running the base sentence for the two serious violent offenses and their corresponding terms for deadly weapon enhancements consecutively. Chicas Carballo now appeals.

ANALYSIS

Chicas Carballo asserts that a violation of his right to confrontation by the trial court's failure to properly apply the Bruton test to Ayala Reyes' statements to police which were introduced at trial, violation of his Sixth Amendment right to present a defense due to improper application of ER 413, and cumulative error deprived him of a fair trial. In a statement of additional grounds for review, Chicas Carballo also claims that he is entitled to a new trial based on Flores' dishonesty. As we find the Sixth Amendment/ER 413 challenge dispositive, we need not reach the other assignments of error.[7]

Chicas Carballo avers that his Sixth Amendment right to present a defense was violated when the trial court refused to allow him to introduce evidence during her testimony of a potential motive for Flores to lie. This court reviews general limitations on the scope of cross-examination for abuse of discretion. State v. Lee, 188 Wn.2d 473, 486, 396 P.3d 316 (2017). A trial court necessarily abuses its

---

[7] If the State chooses to introduce Ayala Reyes' statements to police upon retrial, any potential Bruton issue could be comprehensively addressed in the trial court with briefing and proposed redactions, consistent with case law, which would provide a sufficient record for review on any subsequent appeal.

discretion if the ruling is based on erroneous interpretation of the law or the court fails to recognize that it has discretion. State v. Gaines, 16 Wn. App 2d 52, 57, 479 P.3d 735, 737 (2021). However, a claim for denial of one's Sixth Amendment right to put on a defense is reviewed de novo. State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). The evidence a defendant seeks to admit "must be of at least minimal relevance." State v. Darden, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002). If the proposed evidence is relevant, it is the prosecution's burden to establish that the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial. Jones, 168 Wn.2d at 720. The State's interest in excluding prejudicial evidence must be balanced against the defendant's need for the evidence proposed and relevant information can be withheld only if the prosecution's interest outweighs the defendant's need. Id. "We must remember that 'the integrity of the truth[ ]finding process and [a] defendant's right to a fair trial' are important considerations." Id. (quoting State v. Hudlow, 99 Wn.2d 1, 14, 659 P.2d 514 (1983)). Our supreme court has "therefore noted that for evidence of high probative value 'it appears no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment and [article I, section 22 of the Washington Constitution].'" Id. (quoting Hudlow, 99 Wn.2d at 16) (alterations in original).

The primary and most important component of the right to confrontation is that of meaningful cross-examination of an adverse witness. Darden, 145 Wn.2d at 620. "Confrontation therefore helps assure the accuracy of the fact-finding process." Id. This right to confront must be "zealously guarded." Id. "The right to cross-examine for bias is especially important where . . . that bias stems from a witness's motive to cooperate with the State." State v. Orn, __ Wn. 2d __, 482 P.3d 913, 919 (2021). "[T]he more essential the witness is to the prosecution's case, the more latitude the defense should be given to explore fundamental elements such as motive, bias, [or] credibility." Darden, 145 Wn.2d at 619 (alterations in original).

Although Chicas Carballo was allowed to impeach Flores with various inconsistencies in her police interview and trial testimony, he was prevented from exploring her possible motive to lie. This left the State in a position in which it could shade the jury's perception of why Flores might change her story. The court, prosecution, and defense were all aware that Flores was not a United States citizen and therefore was subject to removal under federal immigration law. However, the trial court did not allow Chicas Carballo to cross-examine her about her immigration status as it related to a possible deportation threat by law enforcement that was uttered during her interrogation. Flores was an essential witness in the State's case against Chicas Carballo, particularly in light of the absence of any other direct evidence that connected him to the crimes.

Before trial, Ayala Reyes moved under ER 413 to introduce evidence of Flores' immigration status as motive to lie, but on a slightly different ground than

later urged by Chicas Carballo. The trial court denied Ayala Reyes' motion, but indicated in its oral and written ruling that the matter could be revisited based on any additional evidence that came out at trial. Chicas Carballo did not present a pretrial motion, but the court based its denial of his midtrial request on its earlier ruling on Ayala Reyes' ER 413 motion, specifically referencing the consideration of additional evidence. The court stated "I denied a motion to allow that testimony without prejudice should additional evidence be provided. I'm not hearing any additional evidence. It sounds like the same issue as was already provided."

ER 413 had gone into effect approximately one month before the trial began. ER 413 provides:

> (a) Criminal Cases; Evidence Generally Inadmissible. In any criminal matter, evidence of a party's or a witness' immigration status shall not be admissible unless immigration status is an essential fact to prove an element of, or a defense to, the criminal offense with which the defendant is charged, or to show bias or prejudice of a witness pursuant to ER 607. The following procedure shall apply prior to any such proposed uses of immigration status evidence to show bias or prejudice of a witness:
> (1) A written pretrial motion shall be made that includes an offer of proof of the relevancy of the proposed evidence.
> (2) The written motion shall be accompanied by an affidavit or affidavits in which the offer of proof shall be stated.
> (3) If the court finds that the offer of proof is sufficient, the court shall order a hearing outside the presence of the jury.
> (4) The court may admit evidence of immigration status to show bias or prejudice if it finds that the evidence is reliable and relevant, and that its probative value outweighs the prejudicial nature of evidence of immigration status.
> (5) Nothing in this section shall be construed to exclude evidence that would result in the violation of a defendant's constitutional rights.

While Chicas Carballo did not present a pretrial motion, or formally join in Ayala Reyes' motion, he did make his position known to the court at the time it was

argued. The ruling on Ayala Reyes' motion was expressly left open for new evidence, but more importantly, by relying on it to deny Chicas Carballo's midtrial request to cross-examine Flores about her immigration status, the trial judge bound Chicas Carballo to both Ayala Reyes' motion and the court's ruling on such. This particular posture creates dissonance in the trial court's two separate rulings against Chicas Carballo on this issue. After trial, Chicas Carballo filed a motion for relief from judgment based in part on the court's denial of his midtrial request to examine Flores' immigration status. The judge denied the motion for relief from judgment on the basis that Chicas Carballo had failed to file a pretrial motion under ER 413, despite the fact that the judge had treated Ayala Reyes' motion as Chicas Carballo's for purposes of the midtrial ruling.

We find guidance in an opinion by Division Two of this court in our review of evidentiary rulings in the context of the right to present a defense. In <u>State v. Grant</u>, the accused argued his right to put on a defense was violated when the trial court denied his request to present an alibi witness due to failure to strictly comply with the procedural requirements set out by statute.[8] 10 Wn. App. 468, 470–72, 519 P.2d 261 (1974). Prior to the start of trial, the prosecution made a timely demand for the identities of any alibi witnesses the defense expected to call. On the last day of the trial, defense sought to present testimony from newly discovered alibi witnesses. The trial court denied the request as untimely under the statute which imposed procedural requirements for alibi witnesses. <u>Id.</u> at 471–72. On review, the trial court's ruling was rejected on the basis that a procedural rule

---

[8] At the time of <u>Grant</u>, procedures as to alibi defenses were set out by statute. They are now contained in CrR 4.7(b)(2)(xii).

cannot be utilized to infringe on an individual's constitutional right to present a defense. Id. at 474–75. Division Two noted that the evidence sought by the defense was highly relevant, noting that it was "evidence which, on its face and if believed by a jury, would be seriously supportive of [Grant's] asserted alibi." Id. at 472. The court went on to

> deem it imperative that in the absence of totally inexcusable neglect no criminal case should be submitted to the trier of the facts without all available material facts being made known to the trier of the facts, not only to the end that substantial justice shall be done, but also because in performing its high function in the best way, justice must satisfy the appearance of justice.

Id. at 474. Grant only reinforces that it has long been the law in our state that rules which impose procedural requirements cannot be wielded as a sword by the State to defeat the constitutional rights of an accused in a criminal trial.

After oral argument in this matter, our supreme court issued its opinion in State v. Orn, 482 P.3d 913. Orn was convicted of attempted first degree murder. Id. at 918. The victim testified at trial, but Orn's attempt to cross-examine him about bias was restricted by the trial court. Id. The victim had worked as a confidential informant for the Kent Police Department in exchange for law enforcement declining to refer certain felonies to the prosecutor for filing against him. Id. Orn's examination of the victim on this matter was limited to one question, which left the jury with incomplete information and potentially incorrect inferences from which to assess the witness' credibility. Id. at 918, 921. The victim was a key witness for the State as "the only testifying eyewitness to the shooting" and, as such, the Supreme Court found the trial court abused its discretion as to the evidentiary ruling, which resulted in a violation of Orn's Sixth Amendment rights.

- 12 -

Id. at 921–22. However, the error was ultimately deemed harmless in light of the wealth of other "[u]ncontradicted evidence [which] linked Orn to the shooting." Id. at 923 (alterations in orginal).

As in Grant and Orn, the court here was aware that the evidence sought by the defense was highly relevant. Chicas Carballo's counsel made the midtrial request to explore Flores' immigration status after much of her direct examination had been presented. His request was discussed outside the presence of jury and he reiterated his specific focus on Flores' potential motive to lie based on threats of deportation by law enforcement during her original interview with detectives. The court indicated its position that no new information had been presented since it had issued the conditional ruling on Ayala Reyes' pretrial motion. Chicas Carballo's attorney responded by stating, "I think it's very relevant that she would stick to her guns for 234 pages [of transcribed statements] that she didn't know anything, and after threats of jail and immigration issues and leading questions[,] she finally remembers something."

The court stated it was unwilling to alter its prior ruling unless new information came to light, which clearly demonstrates that the first ruling was not final. In response to the midtrial request by Chicas Carballo, the court said, "Unless she says something different today, or the reason I made this up is because I was threatened by deportation, that wouldn't appear to be new information." The State appeared to recognize that some of the information about her status was already before the court and said Flores was unlikely to say anything because she was concerned about immigration issues. This comment by the State, coupled with its

later request to explore Flores' status for different reasons in its own examination, suggests that this topic was highly relevant to the case and that Chicas Carballo should have been allowed to explore such in the furtherance of his defense. It also reinforces that the court and the State both had the benefit of the same information that would have been provided in an offer of proof if Chicas Carballo had precisely complied with the procedural requirements of ER 413. This further highlights the lack of prejudice to the State from Chicas Carballo's request to explore the motive to lie as it related to his ability to put on a defense.

In her testimony, Flores conceded to lying and even went so far as admitting during cross-examination that she was fearful she might be arrested and that she was pregnant and did not "want something bad for [her] son." Had she been confronted with the deportation threat and its applicability to her because of her immigration status, a jury could reasonably find that her fear of arrest and for her son's welfare was related to the threat of deportation by police and the corresponding risk of her son's birth in a country she had chosen to leave, rather than in the United States.[9] This is a powerful motive to lie, particularly after dishonesty had been demonstrated by extensive and effective impeachment of this critical witness. Without evidence of a possible motive for Flores' untruthfulness, the impeachment lacked its sting. This ruling also left the State in a much better

---

[9] While it does not drive our analysis here, it is noteworthy that Ayala Reyes' pretrial motion under ER 413 was aimed at a different potential motive for Flores to lie; her possible receipt of an immigration benefit, specifically a U visa. Chicas Carballo, however, asserted Flores' motive to lie was based on the threat of a negative immigration consequence by way of deportation, communicated to her by law enforcement during her interrogation.

Questions of one's immigration status, including eligibility for a benefit or risk of a particular consequence, are fact-specific and often highly nuanced. For that reason alone, the trial court erred by not conducting an independent analysis of Chicas Carballo's midtrial request under ER 413, rather than relying upon its earlier conditional ruling on Ayala Reyes' motion.

position to suggest general fear as justification for her motive to change her story when talking to detectives, despite the fact that the court, State, and defense were all were aware that her immigration status was woven throughout the facts of the case. Chicas Carballo was deprived of the opportunity to introduce evidence to rebut or challenge the State's characterization of the reasons for her untruthfulness.

The trial court appeared unwilling to engage in reweighing the relevance and potential prejudice when Chicas Carballo asserted that Flores' motive to lie, fear from a police threat based on her immigration status, was critical to his defense. As with the evidence of bias in Orn and alibi testimony in Grant, the evidence Chicas Carballo sought was highly relevant and the prejudicial effect on the State was comparatively low in terms of the overall fairness of the trial. Further, concern as to prejudice is undercut by the fact that many of those involved in this case were immigrants. Even if not expressly identified as such to the jury, testimony by various witnesses about El Salvador and the fact that the defendants and Flores participated in the trial with the assistance of interpreters could have led any of the seated jurors to reasonably speculate that several of the trial participants may be immigrants. Therefore any fear of generalized anti-immigrant prejudice by the jury would cut against those parties equally, but most particularly against the defendants. The State recognized how integral immigration was to the case when it sought permission to discuss Flores' experiences in El Salvador prior to coming to the United States. However, the court warned that doing so would open the door for the defense to cross-examine her about her status, so the State

withdrew its request. The mere fact of the State's request, and proffered reasoning, is telling as to the strong probative nature of this realm of testimony which was restricted by the trial court.

This court recently considered the denial of a defense request to introduce evidence of immigration status in State v. Bedada, 13 Wn. App. 2d 185, 463 P.3d 125 (2020). Bedada also involved a trial that occurred shortly after ER 413 had become effective. In that case, we considered the ability to present a defense in light of limits the court placed on cross-examination as to immigration status, concluding that the trial court failed to weigh the probative value against the prejudicial nature of such evidence. Id. In Bedada, the defendant sought to introduce evidence of his own immigration status in order to establish a motive to lie by the victim, his wife, based on her desire to have him removed from the country. Id. at 188–90. When first discussed in motions in limine, the trial court found that it would be unduly prejudicial to the State to have the defendant's immigration status known as the jury might focus on his potential deportation and did not find that the information was relevant. Id. at 190–91. Bedada did not file the requisite pretrial motion to introduce the evidence under ER 413. Id. at 195.

The issue was revisited during trial and defense explained the relevance was due to a motive to fabricate. However, the trial court indicated it was a balancing issue and that neither immigration status nor consequences were relevant. Id. at 191–92. We held that the information was highly relevant and the trial court's failure to properly weigh the proffered evidence was an abuse of discretion. Id. at 204. Our analysis reinforced that the State bears the burden to

establish that the evidence sought would be so prejudicial as to disrupt the fairness of the fact-finding process. Id. at 201. Like the case at hand, the trial court in Bedada provided no justification for its conclusion that the evidence was not relevant. Id. at 200.

As with Grant and Orn, Bedada also guides our review here. Chicas Carballo sought to introduce evidence of the key witness' motive to fabricate. The State even admitted in their closing that Flores did not voluntarily provide her story to police. As in Bedada, no one disputed whether the evidence was reliable and the trial court here similarly failed to engage in the necessary analysis. Id. at 201. The State does not argue prejudice in this case and focuses instead on the relevance of the information. The trial court seems to have proceeded with caution in its application of the newly effective ER 413 and improperly placed the burden on Chicas Carballo. This was a misapplication of the standard.

Additionally, the record before us demonstrates that there was no discussion of a limiting instruction as to the evidence sought by the defense, nor does it appear the final subsection of ER 413(a) was considered by the court in any of its rulings on the matter. ER 413(a)(5) provides, "Nothing in this section shall be construed to exclude evidence that would result in the violation of a defendant's constitutional rights." The ability to provide the motive to fabricate after the key witness admits to being untruthful is critical for the defense in a case in which the State's theory relied so heavily on that witness' credibility. Flores was intimately involved with the co-defendant and was captured on security footage near the scene shortly before Cruces Vasquez was attacked. She was the only

live witness whose credibility could be directly assessed by the jury and who tied Chicas Carballo to the events surrounding Cruces Vasquez' death. After defense attacked Flores' credibility in closing, the State focused its rebuttal argument on the various reasons she was credible, how she should be understood as truthful, and generally attempting to rehabilitate her after her admissions of lying to police.

"[T]he right to present evidence of a witness's bias is essential to the fundamental constitutional right of a criminal defendant to present a complete defense, which encompasses the right to confront and cross-examine adverse witnesses." Orn, 482 P.3d at 919 (citing Davis v. Alaska, 415 U.S. 308, 316, 94 S. Ct. 1105 (1974); Chambers, 410 U.S. at 294; Jones, 168 Wn.2d at 720; Darden, 145 Wn.2d at 620). Violation of the right to present a defense and to confront witnesses is constitutional error. Jones, 168 Wn.2d at 724–25. "Constitutional error is presumed prejudicial and the State bears the burden of showing the error was harmless beyond a reasonable doubt." State v. Chambers, 197 Wn. App. 96, 128, 387 P.3d 1108 (2016).

The State has not met its burden of establishing that the error was harmless. In Orn, the Supreme Court held that even if the key witness had not testified at all, in light of the entire record, the trial outcome would have been the same due to the "uncontradicted evidence" linking Orn to the crime. 482 P.3d at 923. The record before us, however, is strikingly different. Ayala Reyes did not expressly name Chicas Carballo as one of the perpetrators in his statements to police, there was no DNA or other physical evidence to connect Chicas Carballo to the scene, and he was not identified in the security footage that was introduced. At oral argument

before this court, the State reiterated that Flores was the key witness to implicate Chicas Carballo in the murder. Absent Flores' testimony, the only evidence remaining as to Chicas Carballo's possible connection to the murder or conspiracy were phone records showing that he had communicated with Ayala Reyes and the money transfer receipts between them. As such, we cannot conclude that this error was harmless. In light of the violation of Chicas Carballo's right to present a defense, and State's failure to demonstrate that this error was harmless beyond a reasonable doubt, we reverse and remand for a new trial.

WE CONCUR: