# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58988-5-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| PABLO MARQUEZ-GARDUZA, | |
| Appellant. | |

CHE, J.—Pablo Marquez Garduza appeals his convictions of three counts of first degree rape of a child and one count of first degree child molestation.

A jury found that Marquez Garduza raped and molested his step-niece, ZCV, multiple times when she was less than 12 years old.

ZCV's mother, AMC, filed immigration paperwork seeking legal status in the United States prior to trial. At trial, Marquez Garduza sought to impeach AMC with her efforts to change her citizenship status based upon being a qualifying relative of a victim of a crime. The State objected and the trial court sustained the objection under ER 413. The jury convicted Marquez-Garduza.

At sentencing, the trial court found Marquez Garduza indigent as defined in RCW 10.101.010(3)(a)-(c) but imposed a $500 crime victim penalty assessment (VPA).

Marquez Garduza appeals, arguing that (1) the trial court violated his right to present a defense when it prohibited Marquez Garduza from impeaching AMC with questions related to

her immigration status, and (2) the VPA should be stricken from his judgment and sentence.

Additionally, in a statement of additional grounds (SAG), Marquez Garduza argues that

insufficient evidence established that he had "sexual contact" with ZCV. The State concedes the

VPA should be stricken from Marquez Garduza's judgment and sentence.

We hold that (1) the trial court did not violate Marquez Garduza's right to present a

defense by precluding the admission of AMC's immigration status, (2) the VPA should be

stricken based on the trial court's findings that Marquez Garduza was indigent, and (3) Marquez

Garduza's sufficiency of the evidence claim in his SAG fails.

Accordingly, we affirm Marquez Garduza's convictions but remand for the trial court to

strike the VPA from his judgment and sentence.

FACTS

*Background*

Marquez Garduza was ZCV's step-uncle.[1] He worked with ZCV's mother and father in

their business. According to ZCV, she saw Marquez Garduza almost every day during the work

week and he was at their home relatively consistently from when ZCV was five years old until

just before high school.

According to ZCV, when she was around five or six years old,[2] Marquez Garduza and

ZCV were in the garage of ZCV's home. Marquez Garduza told her to take her clothes off, took

---

[1] ZCV and Marquez Garduza were never married and he was about 30 years older than she was. At the time of the events discussed below, both the crimes of first degree child molestation and first degree child rape required that the perpetrator not be married to the victim. *See* Clerk's Papers (CP) at 69 (listing all of Marquez Garduza's crimes as occurring between April 2005 and April 2014); LAWS OF 1988, ch. 145, § 2; LAWS OF 1994, ch. 271, § 303.

[2] ZCV was born in Washington in 2002.

off his own clothes, and then put his penis into her vagina. Marquez Garduza moved the bottom part of his body against ZCV for some time.

Around this time, Dr. Valerie Weiss, ZCV's pediatrician, diagnosed ZCV with vaginitis, or an irritation of the vulva. Dr. Weiss explained that prepubertal girls generally did not get yeast infections, and so she believed that the irritation was mechanical or chemical.

When ZCV was about eight years old, Marquez Garduza was at her house. He told her to go to her room, came into the room, kissed her, pulled her pants down, put his penis in her vagina, moved it in and out of her, and then ejaculated on her. ZCV asked Marquez Garduza what his ejaculation was and he responded that "it was nothing, not to worry about it." Rep. of Proc. (RP) at 232.

Around this time when ZCV was eight years old, AMC reported that ZCV was having vaginal bleeding. Dr. Weiss thought that ZCV was exhibiting precocious puberty as it was uncommon for girls her age to have vaginal bleeding. However, testing by an endocrinologist indicated that ZCV's bleeding was not due to precocious puberty and then ZCV had no further bleeding for six months.

At eight years old, Dr. Weiss diagnosed ZCV with nocturnal enuresis, or bedwetting. At nine years old, Dr. Weiss diagnosed ZCV with vulval vaginitis. According to Dr. Weiss, bedwetting for a girl of this age was very uncommon.

ZCV described another instance when Marquez Garduza raped her sometime before ZCV was 12 years old. Marquez Garduza came over to the apartment where she was living and, when ZCV's dad went to the restroom, Marquez Garduza started touching her and told her "it's just

3

going to be really fast." RP at 241. Marquez Garduza proceeded to put his penis into ZCV's vagina, and he moved back and forth against her until they heard the bathroom door open.

ZCV also remembered Marquez Garduza touching her breasts and vagina on multiple other instances. ZCV said that it was common for Marquez Garduza to come over to her home, that "[h]e was always there after work," and that "most of the time [Marquez Garduza] came over, it was him touching me." RP at 241, 247.

ZCV's nocturnal enuresis continued through when she was around 12 years old. When ZCV began attending sex education classes in fifth or sixth grade, she started to realize that Marquez Garduza's actions were wrong. She started blocking him from touching her and telling him she would tell her parents. ZCV eventually told her best friend.

When ZCV was about 14 years old, she went to Dr. Weiss three times in a span of six months because she was having chest pain.[3] Dr. Weiss believed the chest pain could have been physical but "more likely stress related" and the result of mental health issues. RP at 182. She referred ZCV to a counselor.

After her third visit with Dr. Weiss, when ZCV was in 8th grade, ZCV disclosed the sexual abuse to AMC.[4] AMC did not report ZCV's disclosure to police. Less than a month after the disclosure, ZCV saw Halimeda Ferracane, a licensed marriage and family therapist. During the intake assessment, AMC privately disclosed to Ferracane that ZCV had experienced sexual abuse. According to Ferracane, ZCV was uncomfortable talking about the abuse and AMC shared one incident that occurred while ZCV was nine or ten years old. Ferracane reported the

---

[3] Dr. Weiss testified that she saw ZCV "much more than the average patient." RP at 189.

[4] ZCV told AMC in May 2016.

disclosure to Child Protective Services (CPS).  Law enforcement contacted AMC and arranged a forensic interview with ZCV.

ZCV was examined by Dr. Kimberly Copeland, a child abuse pediatrician, and disclosed to Dr. Copeland that she had sexual contact from the age of three until she was nine.  ZCV told her that during one of these instances, ZCV had observed a white fluid on her leg.

The State charged Marquez Garduza with three counts of first degree child rape and one count of first degree child molestation.

ZCV, AMC, Dr. Weiss, Ferracane, Dr. Kimberly Copeland, and a detective testified consistently with the facts above.

*AMC's Testimony*

AMC testified that Marquez Garduza was her brother-in-law and "a trusted member of [her] family."  RP at 284.  AMC confirmed that Marquez Garduza worked for the family's business.  According to AMC, Marquez Garduza was present in the family home almost every weekend and sometimes stayed for up to a week in the home.  AMC stated that there were occasions where Marquez Garduza was in the home and she was not watching him.

AMC testified that, when ZCV was around 14 years old, ZCV disclosed the sexual abuse to her.  AMC then shared the information with her husband, ZCV's counselor, and law enforcement.  AMC had not called law enforcement herself and stated that ZCV's counselor was the one who called.  AMC stated that she and ZCV had seen the counselor because ZCV was not doing well in school and so Dr. Weiss recommended that they see a counselor.

On cross-examination, Marquez Garduza asked AMC "[a]fter the disclosure by [ZCV], did you ever fill out any immigration forms?" RP at 289. The State objected, and the trial court excused the jury.

Marquez Garduza asserted that whether AMC filed papers for immigration status on the basis of being a qualifying family member of a victim was relevant and went to her motive, which "could be a potential defense." RP at 298. The State argued that such a question was barred by ER 413 and presented the trial court with a written brief.

As an offer of proof through AMC's testimony, Marquez Garduza elicited that AMC filed immigration paperwork seeking legal status.[5] Prior to ZCV's disclosure in 2016, AMC had not previously filed any immigration documentation because she was afraid to be deported and wanted to be close to her children. After ZCV's disclosure, AMC worked with the prosecuting attorney's office to fill out immigration documents. Since then, AMC had gone to an immigration office for fingerprints and photo but had not yet received a response on the application.

---

[5] Marquez Garduza argues that AMC had a pending U visa application. Under 8 C.F.R. § 214.14(b), an undocumented individual is eligible for nonimmigrant status if they comply with certain statutory procedures and can show that (1) they have "suffered substantial physical or mental abuse as a result of having been a victim of qualifying criminal activity," (2) they "possess[] credible and reliable information establishing that he or she has knowledge of the details concerning the qualifying criminal activity upon which his or her petition is based," (3) they have "been helpful, or [are] likely to be helpful to a certifying agency . . . and since the initiation of cooperation, has not refused or failed to provide information and assistance reasonably requested," and (4) the "qualifying criminal activity occurred in the United States." Under 8 U.S.C. § 1101(a)(15)(U)(ii)(I), qualifying relatives of the victim may also be able to obtain a U visa.

The immigration documents presented to the trial court were not admitted into evidence. However, on appeal, the State concedes that the document stated that the "[p]arents reported the crime and they have cooperated with officials in this investigation." 1 2d Suppl. CP at 141.

The State argued, among other things, that Marquez Garduza failed to follow the procedural requirements of ER 413 by not filing a pretrial motion with an offer of proof. *See* ER 413(a)(1).[6] The State also argued that Marquez Garduza sought to "appeal to the passions or prejudices of the jurors with a very speculative theory as to relevancy . . . [t]here's no showing that the victim had any knowledge of this [and] [t]here's no showing that even her mother had any knowledge of a potential avenue for a change in legal status." RP at 296.

The trial court sustained the State's objection. In its ruling, the trial court stated:

> I'm not denying the request on procedural grounds, although the procedure was clearly improper. I'm denying it on substantive grounds. I can admit evidence of immigration status to show bias or prejudice if I find that it's reliable and relevant, and the probative value outweighs the prejudicial nature of the evidence of immigration status which is presumed. In this case, the focus of the proper evidence that we're discussing is not on the victim's actions, because all I have in terms of the record is that the victim doesn't need to file -- has no motive to file a[n] application of this sort, because she is not -- she is a United States citizen. There is no evidence before me, either in the offer of proof or otherwise, from which I could find that, prior to making the disclosure, that the victim believed that there was some tactical advantage to accusing [] Marquez Garduza of the acts for which she accused him. So, her motivation has not been shown to be in the slightest impacted, and the motivations of this witness and impeaching her testimony, which basically is that there was a disclosure to her, that she didn't take it to the police immediately, that she took her daughter to a counselor and the counselor contacted the police, and that she, about a year later, filed this application, none of that bears on really much of anything related to the witness' testimony about where they lived and the periods of time they lived and who lived there. So, it has very limited admissibility for probative value in terms of impeaching this witness, which would be the only one it would apply to. And it's presumed that the evidence is impermissibly prejudicial.
>
> So, for those reasons, both procedural and substantive, the motion -- the objection is sustained.

---

[6] ER 413(a)(1) provides that, prior to using immigration status evidence to show bias or prejudice of a witness, the proponent must make a written pretrial motion that includes an offer of proof of the proposed evidence's relevancy.

RP at 298-99.

*Marquez Garduza's Testimony*

Marquez Garduza testified that he never attempted to kiss ZCV, touch her breasts or private parts, or insert his penis into her vagina.

Marquez Garduza testified that he would go the family's home "often, because I would work every day with [my brother]." RP at 388. And, at times, he would go into the home "because they trusted me." RP at 388. However, Marquez Garduza stated that he never went to their home on the weekend.

According to Marquez Garduza, he had only spent the night at the family's home once and ZCV's dad and AMC were there that one night. One time, Marquez Garduza was asked to watch AMC and her husband's kids for a few hours, including ZCV, but he stated that he never went into a bedroom alone with ZCV. He additionally stated that he never tried to get ZCV alone in a garage.

*Procedural*

The jury found Marquez Garduza guilty of all charges.

At sentencing, the trial court found Marquez Garduza indigent as defined in RCW 10.101.010(3)(a)-(c). The trial court sentenced Marquez Garduza to an indeterminate sentence with a 300-month confinement minimum term and life maximum term. The trial court imposed a $500 VPA.

Marquez Garduza appeals.

ANALYSIS

I.  SIXTH AMENDMENT RIGHT TO PRESENT A DEFENSE

Marquez Garduza argues that the trial court violated his constitutional right to present a defense by denying his inquiry into AMC's application for favorable immigration status as a family member of a victim.  Specifically, Marquez Garduza asserts that AMC's immigration status efforts were highly relevant to the issue of AMC's credibility and that the constitutional error was not harmless.  We disagree.

A.     *Legal Principles*

Under the state and federal constitutions, criminal defendants have a constitutional right to present a defense.  U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22; *State v. Restvedt*, 26 Wn. App. 2d 102, 123, 527 P.3d 171 (2023).  This right includes "the right to confront and cross-examine adverse witnesses."  *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting *State v. Darden*, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002)).

However, a defendant's constitutional right to present a defense "is not absolute."  *Restvedt*, 26 Wn. App. 2d at 123; *see also State v. Arndt*, 194 Wn.2d 784, 812, 453 P.3d 696 (2019).  A defendant lacks the right to present evidence that is not relevant.  *State v. Orn*, 197 Wn.2d 343, 352, 482 P.3d 913 (2021).  Additionally, our courts have held that it is permissible, under the Constitution, for judges to "'exclude evidence that is repetitive . . ., only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.'"  *State v. Jennings*, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727 (2006); *see* ER 403.  Evidence is "relevant" if it has "any tendency

to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.

We apply a two-part test when determining whether a defendant's Sixth Amendment right to present a defense has been violated by an evidentiary ruling. *Restvedt*, 26 Wn. App. 2d at 123 (citing to *Jennings*, 199 Wn.2d at 58.

First, we review the trial court's evidentiary ruling for an abuse of discretion. *Id*. A trial court abuses its discretion when it "'relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law.'" *State v. Keller*, 2 Wn.3d 887, 921, 545 P.3d 790 (2024) (quoting *Arndt*, 194 Wn.2d at 799). However, grounds for reversal resulting from an evidentiary error only arise if the error results in prejudice. *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001). An evidentiary error is prejudicial if, "'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *Neal*, 144 Wn.2d at 611 (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986).

Second, we consider de novo the constitutional question of whether the ruling deprived the defendant of his Sixth Amendment right to present a defense. *Restvedt*, 26 Wn. App. 2d at 123. Even if the trial court's evidentiary ruling was proper, the ruling could still deprive a defendant of their constitutional right. *Id.* at 123.

To determine if a defendant's right to present a defense was violated by a limitation imposed on cross-examination, we apply a three-part test. *Orn*, 197 Wn.2d at 353. We first review "whether the excluded evidence was at least minimally relevant." *Orn*, 197 Wn.2d at 353. If it was, we next consider whether the evidence was "'so prejudicial as to disrupt the

fairness of the factfinding process' at trial." *Id.* (quoting *Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983)). Finally, we consider whether the State's interest in excluding the evidence outweighs the defendant's need to present it. *Id.*

Reversal is not automatic even if a constitutional violation of the defendant's right to present a defense occurs. *See id.* at 359 ("Violations of the right . . . to present a defense . . . [is] subject to constitutional harmless error review."). Where there has been erroneous exclusion of impeachment evidence, we do not grant reversal if, "assuming that the damaging potential of the cross-examination were fully realized, [we can] nonetheless say that the error was harmless beyond a reasonable doubt.'" *State v. Romero-Ochoa*, 193 Wn.2d 341, 348, 440 P.3d 994 (2019) (alterations in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)). If we are convinced, in examining the entire record, that the jury would have reached the same verdict absent the error, the error was harmless. *Id.* The State bears the burden of proving that the harmlessness of a right to present a defense violation. *Orn*, 197 Wn.2d at 359; *see also State v. Whelchel*, 115 Wn.2d 708, 728, 801 P.2d 948 (1990) ("[T]he State bears the burden on proving that [a constitutional] error was harmless.").

B.    *Marquez Garduza's Claim Fails*

Marquez Garduza argues that reversal is warranted because the trial court erroneously prevented him from impeaching AMC's testimony with immigration evidence. He asserts that the trial court erred in its application of ER 413 and abused its discretion by deciding as no reasonable court would have done given the circumstances of his case. He further argues that the trial court erred when it reasoned that prejudice to the State of the jury hearing about AMC's purported immigration status was "presumed." Reply Br. at 8; Br. of Appellant at 17. Marquez

Garduza asserts that these errors were prejudicial because of the centrality of AMC's credibility in the State's case. *See* Br. of Appellant at 23 (arguing constitutional harmless error applies and occurred).

Even assuming without deciding that the trial court abused its discretion in its decision to exclude evidence of AMC's immigration status under ER 413, Marquez Garduza's claim fails because any evidentiary error in excluding the evidence would have been harmless in his case. Moreover, under the circumstances here, excluding the evidence did not violate Marquez Garduza's right to present a defense.

In September 2017, our Supreme Court adopted ER 413, "prohibiting the introduction of evidence concerning a person's immigration status unless certain procedural requirements are met." *State v. Ritchie*, 24 Wn. App. 2d 618, 633, 520 P.3d 1105 (2022). ER 413, as applied to criminal cases, provides:

> (a) Criminal Cases; Evidence Generally Inadmissible. In any criminal matter, evidence of a party's or a witness's immigration status shall not be admissible unless immigration status is an essential fact to prove an element of, or a defense to, the criminal offense with which the defendant is charged, or to show bias or prejudice of a witness pursuant to ER 607. The following procedure shall apply prior to any such proposed uses of immigration status evidence to show bias or prejudice of a witness:

> (1) A written pretrial motion shall be made that includes an offer of proof of the relevancy of the proposed evidence.

> (2) The written motion shall be accompanied by an affidavit or affidavits in which the offer of proof shall be stated.

> (3) If the court finds that the offer of proof is sufficient, the court shall order a hearing outside the presence of the jury.

> (4) The court may admit evidence of immigration status to show bias or prejudice if it finds that the evidence is reliable and relevant, and that its probative value outweighs the prejudicial nature of evidence of immigration status.

(5) Nothing in this section shall be construed to exclude evidence if the exclusion of that evidence would violate a defendant's constitutional rights.

(Boldface omitted.)

As our Supreme Court held in *Orn*:

"A witness's bias is 'always relevant as discrediting the witness and affecting the weight of his testimony' . . . And 'the more essential the witness is to the prosecution's case, the more latitude the defense should be given to explore fundamental elements such as motive, bias, [or] credibility.'"

197 Wn.2d at 353-54.

Division One of this court has twice reviewed a trial court's limitation on cross-examining a witness' immigration status and whether an error with the limitation warrants reversal. *State v. Bedada,* 13 Wn. App. 2d 185, 198, 463 P.3d 125 (2020); *State v. Carballo*, 17 Wn. App. 2d 337, 486 P.3d 142. Both cases involved trials occurring shortly after ER 413 became effective. *Carballo*, 17 Wn. App. 2d at 353.

In *Bedada*, the defendant sought to introduce evidence of his own immigration status for the purpose of showing bias or prejudice of the State's "key witness," the victim of the alleged crimes. 13 Wn. App. 2d at 199. The State charged Bedada with multiple crimes based on Bedada's alleged assaultive and threatening behavior towards his wife and their children. *Id.* at 188-190. All charges were primarily supported by the testimony of the wife. *Id.* at 188.

During trial, the jury heard "testimony indicating that Bedada and [his wife] were Ethiopian immigrants and [] that [his wife] wanted Bedada to return to Ethiopia." *Id.* at 201. Bedada wanted to introduce the wife's US citizenship status and his own nonpermanent resident status to demonstrate her intent to prompt his deportation so she and their kids would not have to

13

deal with him anymore. *Id.* at 191. However, the trial court excluded the evidence based on relevance. *Id.*

Division One held that the trial court abused its discretion under ER 413 and reversed Bedada's convictions. *Id.* at 202-205. In its reasoning, Division One explained that the wife "was the primary witness against Bedada in every charge against him. She was the State's most important witness." *Id.* at 204-205. It then noted how demonstrating bias of a key witness has long been considered an important element of a defendant's right to present a defense. *Id.* at 205 (citing to *State v. Fisher*, 165 Wn.2d 727, 752, 202 P.3d 937 (2009)).

In *Carballo*, the State charged the defendant with first degree murder and conspiracy to commit first degree murder. 17 Wn. App. 2d at 340. The trial court prohibited the defendant from cross-examining a witness regarding "a possible deportation threat by law enforcement that was uttered during [the witness'] interrogation." *Id.* at 347. The trial court, State, and Carballo were all aware that the witness was not a United States citizen and, therefore, was subject to removal under federal immigration law. *Id.* at 346-47. The witness conceded to lying and admitted she was fearful of being arrested, was pregnant, and did not want something bad to happen to her child. *Id.* at 351. The trial court allowed Carballo to impeach the witness with various inconsistencies between her police interview and trial testimony but prevented Carballo from exploring the witness' possible motive to lie. *Id.* at 346. Like the trial court in *Bedada*, the trial court ruled that the proffered immigration evidence was not relevant without justifying that conclusion. *Id.* at 353.

Division One held that the witness was "essential . . . in the State's case against . . . Carballo, particularly in light of the absence of any other direct evidence that connected him to

the crimes." *Id.* at 347. The court then held that the trial court misapplied ER 413's standard by improperly putting the burden on Carballo because "Carballo sought to introduce evidence of the key witness' motive to fabricate," no one disputed the reliability of proffered evidence, and the trial court failed to engage in ER 413's necessary analysis. *Id.* at 353. Accordingly, Division One concluded that the trial court violated Carballo's right to present a defense. *Id.* at 355.

The court reversed Carballo's convictions, holding that the State failed to show that the violation was harmless beyond a reasonable doubt. *Id.* The court noted that the State conceded that the witness was the key evidence implicating Carballo in the murder and that, without the witness' testimony, the remaining evidence possibly connecting Carballo to the crimes consisted of the exchange of phone calls and money transfers with a codefendant. *Id.*

Here, unlike in *Bedada* and *Carballo*, AMC was neither an essential nor key witness in the State's case. Considering the entire record, we conclude that any evidentiary error related to excluding the immigration status evidence would have been harmless. Although Marquez Garduza asserts that AMC's credibility was central to the State's case, we disagree.

To find Marquez Garduza guilty of first degree rape of a child, the jury had to find that he "ha[d] sexual intercourse with [ZCV] who [was] less than twelve years old and the [Marquez Garduza was] at least twenty-four months older than [ZCV]." RCW 9A.44.073. To find him guilty of first degree child molestation, the jury had to find that Marquez Garduza "ha[d], or knowingly cause[d] another person under the age of eighteen to have, sexual contact with [ZCV] who [was] less than twelve years old and the perpetrator [was] at least thirty-six months older than [ZCV]." RCW 9A.44.083.

15

AMC's testimony was not essential to the State's prosecution of Marquez Garduza. AMC provided very little new evidence that was not testified to by other witnesses such as ZCV, her doctor, and her therapist. Even if the jury had found AMC not credible due to her immigration status efforts, the following testimony still would have remained: ZCV's testimony describing each incident of rape and molestation by Marquez Garduza, ZCV disclosing the abuse to others, testimony from ZCV's pediatrician as well as ZCV regarding the physical and mental symptoms she had during the years when the incidents occurred, and Marquez Garduza's own testimony that he would "often" be at the home where ZCV lived. RP at 388. Although AMC also testified about ZCV disclosing sexual abuse to her and acknowledged that ZCV initially attended counseling for school-related issues, ZCV's allegation that Marquez Garduza sexually abused her was corroborated by evidence that ZCV suffered from physical and emotional symptoms around the time when alleged abuse occurred. AMC's testimony provided very little new evidence that was not testified to by other witnesses.

Marquez Garduza generally denied that he inappropriately touched or had sexual contact with ZCV. The only other part of Marquez Garduza's testimony that conflicted with AMC's testimony was his assertion that he had spent the night only once and never went to their home on the weekend. The large proportion of their testimonies were consistent, including that Marquez Garduza was present frequently at the home and, during at least one occurrence, Marquez Garduza was in the home and with ZCV while AMC was not there.

Unlike the witnesses in *Bedada* and *Carballo*, the only witness possibly impeachable by the proffered immigration evidence was not a key or essential witness to the State's case. And considering the evidence presented as a whole, it is not within reasonable probabilities that, had

16

the impeachment evidence been admitted, the outcome of the trial would have been materially affected. *Neal*, 144 Wn.2d at 611.

To be sure, the right to present evidence of a witness' bias "is essential to the fundamental constitutional right of a criminal defendant to present a complete defense." *Orn*, 482 P.3d at 919. However, this right is not without limitation and it is permissible, under the Constitution, for judges to exclude "'only marginally relevant'" evidence. *Jennings*, 199 Wn.2d at 63 (quoting *Holmes*, 547 U.S. at 326-27). AMC's U visa application was only marginally relevant to any facts of consequence in the case. *See* ER 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

Marquez Garduza's proffered evidence suggested that, in April 2017, AMC completed a U visa application. However, the date on the application was over a year after ZCV disclosed the sexual abuse to AMC. And, even after ZCV disclosed the sexual abuse to a therapist after her disclosure to AMC, CPS was notified, and law enforcement contacted AMC, AMC still did not file the application. Because of the timing of the application, it is unclear what relevance, if any, the proffered evidence had in ZCV's disclosures or AMC's actions leading up to spring 2017, nor does Marquez Garduza argue such.

Instead, Marquez Garduza claims that the proffered evidence was relevant to AMC's testimony at trial. However, as discussed above, AMC's testimony was largely cumulative, including with Marquez Garduza's testimony, and, if anything, merely corroborated ZCV's

testimony that she disclosed the sexual abuse to AMC and Marquez Garduza had been at her home with access to ZCV.

Moreover, unlike the witness in *Carballo*, AMC was not a "key witness" implicating Marquez Garduza in the rape and sexual molestation of ZCV. Absent AMC's testimony, significant evidence remained implicating Marquez Garduza in the crimes, including ZCV's testimony identifying Marquez Garduza as the one who sexually assaulted her. Because the proffered evidence was "only marginally relevant" to the case considering AMC's testimony, the trial court judge was permitted to exclude the evidence. *Jennings*, 199 Wn.2d at 63.

We hold that, even if we assume without deciding that the trial court abused its discretion in applying ER 413, any evidentiary error was nevertheless harmless. Additionally, because impeaching AMC's testimony with the proffered evidence was not minimally relevant to the issues at trial, the trial court did not violate Marquez Garduza's Sixth Amendment right to present a defense. Accordingly, Marquez Garduza's claim fails.

## II. VPA

Marquez Garduza next argues a $500 VPA fee imposed in his judgment and sentence should be stricken because the trial court found Marquez Garduza indigent. The State agrees that the fee should be stricken. We agree with both parties.

At sentencing, the trial court found Marquez Garduza indigent as defined in RCW 10.101.010(3)(a)-(c). However, as a part of Marquez Garduza's judgment and sentence, the trial court ordered Marquez Garduza to pay a $500 VPA fee.

The VPA can no longer be imposed on defendants found indigent as defined in RCW 10.01.160(3) at the time of sentencing. RCW 7.68.035(4); LAWS OF 2023, ch. 449, § 1; *State v.*

18

*Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023), *review granted*, 4 Wn.3d 1009 (2025). And, this change in the law applies to cases on direct appeal, such as Marquez Garduza's. *See id.*

We hold that the $500 VPA fee should be stricken from Marquez Garduza's judgment and sentence.

### III. STATEMENT OF ADDITIONAL GROUNDS

Finally, in a SAG, Marquez Garduza challenges the sufficiency of the evidence regarding him having "sexual contact" with ZCV. SAG at 2. We disagree that the State presented insufficient evidence.

We review challenges to the sufficiency of the evidence de novo. *State v. Heutink*, 12 Wn. App. 2d 336, 359, 458 P.3d 796 (2020). In reviewing whether sufficient evidence supported a defendant's conviction, we determine whether any rational juror, viewing the evidence in the light most favorable to the State, could have found the essential elements of the charged crime beyond a reasonable doubt based on the evidence presented at trial. *State v. Condon*, 182 Wn.2d 307, 314, 343 P.3d 357 (2015).

"'A claim of insufficiency [of evidence] admits the truth of the State's evidence and all inferences that reasonably can be drawn [from it].'" *Id.* (alterations in original) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). Circumstantial and direct evidence are equally reliable. *State v. Notaro*, 161 Wn. App. 654, 671, 255 P.3d 774 (2011). Additionally, we defer to the jury on issues of "conflicting testimony[, credibility of witnesses,] and evaluating the persuasiveness of the evidence." *State v. Bergstrom*, 199 Wn.2d 23, 41, 502 P.3d 837 (2022) (alterations in original) (quoting *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

The crime of first degree child molestation requires "sexual contact" while the crime of first degree rape of a child can include certain "sexual contact" or could involve contact qualifying as "sexual intercourse." RCW 9A.44.083 (first degree child molestation); RCW 9A.44.073 (first degree child rape); RCW 9A.44.010(14) (defining "sexual intercourse").[7] "'Sexual contact' means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." RCW 9A.44.010(13).[8] "Sexual intercourse":

> (a) has its ordinary meaning and occurs upon any penetration, however slight, and

> (b) Also means any penetration of the vagina or anus however slight, by an object, when committed on one person by another, whether such persons are of the same or opposite sex, except when such penetration is accomplished for medically recognized treatment or diagnostic purposes, and

> (c) Also means any act of sexual contact between persons involving the sex organs of one person and the mouth or anus of another whether such persons are of the same or opposite sex.

RCW 9A.44.010(14).

Marquez Garduza asserts that the evidence showed the purpose of his touching ZCV was equivocal and there was no evidence of threats or requests for ZCV to not tell anyone. However, the statutory definition of "sexual contact" does not require threats or requests for ZCV to not disclose any touching. RCW 9A.44.010(13). Additionally, Marquez Garduza's

---

[7] None of the relevant language in these statutes has changed between the dates of Marquez Garduza's crimes and the present, and so, we cite to the current version of these statutes.

[8] We additionally cite to the current version of RCW 9A.44.010(13) as the definition of "sexual contact" has remained unchanged through the various amendments between the dates of Marquez Garduza's crimes and the present.

testimony may have presented what he asserts, but in a sufficiency of the evidence claim (1) we view the evidence in the light most favorable to the State, and (2) make all reasonable inferences in favor of the State. *Condon*, 182 Wn.2d at 314. As discussed above, ZCV and others provided sufficient testimony such that a rational jury could have found Marquez Garduza had sexual contact with ZCV. And, because we defer to the jury on issues of conflicting testimony, witness credibility, or persuasiveness of the evidence, Marquez Garduza's argument that his purpose in touching ZCV was equivocal fails. *See Bergstrom*, 199 Wn.2d at 41.

We hold that sufficient evidence supported the jury's findings that Marquez Garduza had sexual contact with ZCV and, thus, Marquez Garduza's SAG claim fails.

CONCLUSION

We affirm Marquez Garduza's convictions but remand for the trial court to strike the $500 VPA fee from his judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Che, J.

We concur:

_____
Maxa, P.J.

_____
Glasgow, J.